## MOORE ET AL. *v.* DEMPSEY, KEEPER OF THE ARKANSAS STATE PENITENTIARY.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

No. 199.  Argued January 9, 1923.—Decided February 19, 1923.

1. Upon an appeal from an order of the District Court dismissing a petition for *habeas corpus* upon demurrer, the allegations of fact pleaded in the petition and admitted by the demurrer must be accepted as true.  P. 87.
2. A trial for murder in a state court in which the accused are hurried to conviction under mob domination without regard for their rights, is without due process of law and absolutely void. P. 90.
3. In the absence of sufficient corrective process afforded by the state courts, when persons held under a death sentence and alleging facts showing that their conviction resulted from such a trial, apply to the Federal District Court for *habeas corpus,* that court must find whether the facts so alleged are true, and whether they can be explained so far as to leave the state proceedings undisturbed.  P. 91.

Reversed.

APPEAL from an order of the District Court dismissing a petition for *habeas corpus* upon demurrer.

*Mr. U. S. Bratton* and *Mr. Moorfield Storey* for appellants.

*Mr. Elbert Godwin,* with whom *Mr. J. S. Utley,* Attorney General of the State of Arkansas, and *Mr. Wm. T. Hammock* were on the brief, for appellee.

MR. JUSTICE HOLMES delivered the opinion of the Court.

This is an appeal from an order of the District Court for the Eastern District of Arkansas dismissing a writ of *habeas corpus* upon demurrer, the presiding judge certifying that there was probable cause for allowing the appeal. There were two cases originally, but by agreement they were consolidated into one. The appellants are five negroes who were convicted of murder in the first degree and sentenced to death by the Court of the State of Arkansas. The ground of the petition for the writ is that the proceedings in the State Court, although a trial in form, were only a form, and that the appellants were hurried to conviction under the pressure of a mob without any regard for their rights and without according to them due process of law.

The case stated by the petition is as follows, and it will be understood that while we put it in narrative form, we are not affirming the facts to be as stated but only what we must take them to be, as they are admitted by the demurrer: On the night of September 30, 1919, a number of colored people assembled in their church were attacked and fired upon by a body of white men, and in the disturbance that followed a white man was killed. The report of the killing caused great excitement and was followed by the hunting down and shooting of many negroes and also by the killing on October 1 of one Clinton Lee, a white man, for whose murder the petitioners were indicted. They seem to have been arrested with many others on the same day. The petitioners say that Lee must have been killed by other whites, but that we leave on one side as what we have to deal with is not the petitioners' inno-

cence or guilt but solely the question whether their constitutional rights have been preserved. They say that their meeting was to employ counsel for protection against extortions practiced upon them by the landowners and that the landowners tried to prevent their effort, but that again we pass by as not directly bearing upon the trial. It should be mentioned however that O. S. Bratton, a son of the counsel who is said to have been contemplated and who took part in the argument here, arriving for consultation on October 1, is said to have barely escaped being mobbed; that he was arrested and confined during the month on a charge of murder and on October 31 was indicted for barratry, but later in the day was told that he would be discharged but that he must leave secretly by a closed automobile to take the train at West Helena, four miles away, to avoid being mobbed. It is alleged that the judge of the Court in which the petitioners were tried facilitated the departure and went with Bratton to see him safely off.

A Committee of Seven was appointed by the Governor in regard to what the committee called the " insurrection " in the county. The newspapers daily published inflammatory articles. On the 7th a statement by one of the committee was made public to the effect that the present trouble was " a deliberately planned insurrection of the negroes against the whites, directed by an organization known as the ' Progressive Farmers' and Household Union of America ' established for the purpose of banding negroes together for the killing of white people." According to the statement the organization was started by a swindler to get money from the blacks.

Shortly after the arrest of the petitioners a mob marched to the jail for the purpose of lynching them but were prevented by the presence of United States troops and the promise of some of the Committee of Seven and other leading officials that if the mob would refrain, as

the petition puts it, they would execute those found guilty
in the form of law.  The Committee's own statement was
that the reason that the people refrained from mob vio-
lence was " that this Committee gave our citizens their
solemn promise that the law would be carried out."  Ac-
cording to affidavits of two white men and the colored
witnesses on whose testimony the petitioners were con-
victed, produced by the petitioners since the last decision
of the Supreme Court hereafter mentioned, the Commit-
tee made good their promise by calling colored witnesses
and having them whipped and tortured until they would
say what was wanted, among them being the two relied
on to prove the petitioners' guilt.  However this may be,
a grand jury of white men was organized on October 27
with one of the Committee of Seven and, it is alleged,
with many of a posse organized to fight the blacks, upon
it, and on the morning of the 29th the indictment was
returned.  On November 3 the petitioners were brought
into Court, informed that a certain lawyer was appointed
their counsel and were placed on trial before a white
jury—blacks being systematically excluded from both
grand and petit juries.  The Court and neighborhood were
thronged with an adverse crowd that threatened the most
dangerous consequences to anyone interfering with the
desired result.  The counsel did not venture to demand
delay or a change of venue, to challenge a juryman or to
ask for separate trials.  He had had no preliminary con-
sultation with the accused, called no witnesses for the
defence although they could have been produced, and did
not put the defendants on the stand.  The trial lasted
about three-quarters of an hour and in less than five
minutes the jury brought in a verdict of guilty of murder
in the first degree.  According to the allegations and
affidavits there never was a chance for the petitioners to
be acquitted; no juryman could have voted for an
acquittal and continued to live in Phillips County and if

any prisoner by any chance had been acquitted by a jury he could not have escaped the mob.

. The averments as to the prejudice by which the trial was environed have some corroboration in appeals to the Governor, about a year later, earnestly urging him not to interfere with the execution of the petitioners. One came from five members of the Committee of Seven, and stated in addition to what has been quoted heretofore that " all our citizens are of the opinion that the law should take its course." Another from a part of the American Legion protests against a contemplated commutation of the sentence of four of the petitioners and repeats that a " solemn promise was given by the leading citizens of the community that if the guilty parties were not lynched, and let the law take its course, that justice would be done and the majesty of the law upheld." A meeting of the Helena Rotary Club attended by members representing, as it said, seventy-five of the leading industrial and commercial enterprises of Helena, passed a resolution approving and supporting the action of the American Legion post. The Lions Club of Helena at a meeting attended by members said to represent sixty of the leading industrial and commercial enterprises of the city passed a resolution to the same effect. In May of the same year, a trial of six other negroes was coming on and it was represented to the Governor by the white citizens and officials of Phillips County that in all probability those negroes would be lynched. It is alleged that in order to appease the mob spirit and in a measure secure the safety of the six the Governor fixed the date for the execution of the petitioners at June 10, 1921, but that the execution was stayed by proceedings in Court; we presume the proceedings before the Chancellor to which we shall advert

In *Frank* v. *Mangum*, 237 U. S. 309, 335, it was recognized of course that if in fact a trial is dominated by a

mob so that there is an actual interference with the course of justice, there is a departure from due process of law; and that " if the State, supplying no corrective process, carries into execution a judgment of death or imprisonment based upon a verdict thus produced by mob domination, the State deprives the accused of his life or liberty without due process of law." We assume in accordance with that case that the corrective process supplied by the State may be so adequate that interference by *habeas corpus* ought not to be allowed. It certainly is true that mere mistakes of law in the course of a trial are not to be corrected in that way. But if the case is that the whole proceeding is a mask—that counsel, jury and judge were swept to the fatal end by an irresistible wave of public passion, and that the State Courts failed to correct the wrong, neither perfection in the machinery for correction nor the possibility that the trial court and counsel saw no other way of avoiding an immediate outbreak of the mob can prevent this Court from securing to the petitioners their constitutional rights.

In this case a motion for a new trial on the ground alleged in this petition was overruled and upon exceptions and appeal to the Supreme Court the judgment was affirmed. The Supreme Court said that the complaint of discrimination against petitioners by the exclusion of colored men from the jury came too late and by way of answer to the objection that no fair trial could be had in the circumstances, stated that it could not say " that this must necessarily have been the case "; that eminent counsel was appointed to defend the petitioners, that the trial was had according to law, the jury correctly charged, and the testimony legally sufficient. On June 8, 1921, two days before the date fixed for their execution, a petition for *habeas corpus* was presented to the Chancellor and he issued the writ and an injunction against the execution of the petitioners; but the Supreme Court of the State

held that the Chancellor had no jurisdiction under the state law whatever might be the law of the United States. The present petition perhaps was suggested by the language of the Court: " What the result would be of an application to a Federal Court we need not inquire." It was presented to the District Court on September 21. We shall not say more concerning the corrective process afforded to the petitioners than that it does not seem to us sufficient to allow a Judge of the United States to escape the duty of examining the facts for himself when if true as alleged they make the trial absolutely void. We have confined the statement to facts admitted by the demurrer. We will not say that they cannot be met, but it appears to us unavoidable that the District Judge should find whether the facts alleged are true and whether they can be explained so far as to leave the state proceedings undisturbed.

   *Order reversed. The case to stand for hearing before the District Court.*

Mr. Justice McREYNOLDS, dissenting.

We are asked to overrule the judgment of the District Court discharging a writ of *habeas corpus* by means of which five negroes sought to escape electrocution for the murder of Clinton Lee. § 753, Rev. Stats.[1] They were convicted and sentenced in the Circuit Court of Phillips County, Arkansas, two years before the writ issued. The petition for the writ was supported by affidavits of these five ignorant men whose lives were at stake, the *ex parte* affidavits of three other negroes who had pleaded guilty

---

[1] " The writ of habeas corpus shall in no case extend to a prisoner in jail, unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States; or of an order, process, or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States; or, being a subject

and were then confined in the penitentiary under sentences for the same murder, and the affidavits of two white men—low villains according to their own admissions. It should be remembered that to narrate the allegations of the petition is but to repeat statements from these sources. Considering all the circumstances—the course of the cause in the state courts and upon application here for certiorari, etc.,—the District Court held the alleged facts insufficient *prima facie* to show nullity of the original judgment.

The matter is one of gravity. If every man convicted of crime in a state court may thereafter resort to the federal court and by swearing, as advised, that certain allegations of fact tending to impeach his trial are " true to the best of his knowledge and belief," thereby obtain as of right further review, another way has been added to a list already unfortunately long to prevent prompt punishment. The delays incident to enforcement of our criminal laws have become a national scandal and give serious alarm to those who observe. Wrongly to decide the present cause probably will produce very unfortunate consequences.

In *Frank* v. *Mangum,* 237 U. S. 309, 325, 326, 327, 329, 335, after great consideration a majority of this Court approved the doctrine which should be applied here. The doctrine is right and wholesome. I can not agree now to put it aside and substitute the views expressed by the minority of the Court in that cause.

Much of the opinion in the *Frank Case* might be repeated here if emphasis were necessary. It will suffice

or citizen of a foreign state, and domiciled therein, is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, or order, or sanction of any foreign state, or under color thereof, the validity and effect whereof depend upon the law of nations; or unless it is necessary to bring the prisoner into court to testify."

to quote a few paragraphs; but fully to understand the whole should be read.

"In dealing with these contentions, we should have in mind the nature and extent of the duty that is imposed upon a Federal court on application for the writ of *habeas corpus* under § 753, Rev. Stat. Under the terms of that section, in order to entitle the present appellant to the relief sought, it must appear that he is held in custody in violation of the Constitution of the United States. *Rogers* v. *Peck*, 199 U. S. 425, 434. Moreover, if he is held in custody by reason of his conviction upon a criminal charge before a court having plenary jurisdiction over the subject-matter or offense, the place where it was committed, and the person of the prisoner, it results from the nature of the writ itself that he cannot have relief on *habeas corpus.* Mere errors in point of law, however serious, committed by a criminal court in the exercise of its jurisdiction over a case properly subject to its cognizance, cannot be reviewed by *habeas corpus.* That writ cannot be employed as a substitute for the writ of error. . . .

"As to the ' due process of law ' that is required by the Fourteenth Amendment, it is perfectly well settled that a criminal prosecution in the courts of a State, based upon a law not in itself repugnant to the Federal Constitution, and conducted according to the settled course of judicial proceedings as established by the law of the State, so long as it includes notice, and a hearing, or an opportunity to be heard, before a court of competent jurisdiction, according to established modes of procedure, is ' due process' in the constitutional sense. . . .

" It is, therefore, conceded by counsel for appellant that in the present case we may not review irregularities or erroneous rulings upon the trial, however serious, and that the writ of *habeas corpus* will lie only in case the judgment under which the prisoner is detained is shown to be abso-

lutely void for want of jurisdiction in the court that pronounced it, either because such jurisdiction was absent at the beginning or because it was lost in the course of the proceedings. . . .

"But it would be clearly erroneous to confine the inquiry to the proceedings and judgment of the trial court. The laws of the State of Georgia (as will appear from decisions elsewhere cited), provide for an appeal in criminal cases to the Supreme Court of that State upon divers grounds, including such as those upon which it is here asserted that the trial court was lacking in jurisdiction. . . .

"It follows as a logical consequence that where, as here, a criminal prosecution has proceeded through all the courts of the State, including the appellate as well as the trial court, the result of the appellate review cannot be ignored when afterwards the prisoner applies for his release on the ground of a deprivation of Federal rights sufficient to oust the State of its jurisdiction to proceed to judgment and execution against him. This is not a mere matter of comity, as seems to be supposed. The rule stands upon a much higher plane, for it arises out of the very nature and ground of the inquiry into the proceedings of the state tribunals, and touches closely upon the relations between the state and the Federal governments. As was declared by this court in *Ex parte Royall,* 117 U. S. 241, 252—applying in a *habeas corpus* case what was said in *Covell* v. *Heyman,* 111 U. S. 176, 182, a case of conflict of jurisdiction:—' The forbearance which courts of coördinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity, with perhaps no higher sanction than the utility which comes from concord; but between state courts and those of the United States it is something more. It is a principle of right and of law,

and, therefore, of necessity.' And see *In re Tyler, Petitioner,* 149 U. S. 164, 186. . . .

" We of course agree that if a trial is in fact dominated by a mob, so that the jury is intimidated and the trial judge yields, and so that there is an actual interference with the course of justice, there is, in that court, a departure from due process of law in the proper sense of that term. And if the State, supplying no corrective process, carries into execution a judgment of death or imprisonment based upon a verdict thus produced by mob domination, the State deprives the accused of his life or liberty without due process of law.

" But the State may supply such corrective process as to it seems proper. Georgia has adopted the familiar procedure of a motion for a new trial followed by an appeal to its Supreme Court, not confined to the mere record of conviction but going at large, and upon evidence adduced outside of that record, into the question whether the processes of justice have been interfered with in the trial court. Repeated instances are reported of verdicts and judgments set aside and new trials granted for disorder or mob violence interfering with the prisoner's right to a fair trial. *Myers* v. *State,* 97 Georgia 76(5), 99; *Collier* v. *State,* 115 Georgia, 803."

Let us consider with some detail what was presented to the court below.

There was the complete record of the cause in the state courts—trial and Supreme—showing no irregularity. After indictment the defendants were arraigned for trial and eminent counsel appointed to defend them. He cross-examined the witnesses, made exceptions and evidently was careful to preserve a full and complete transcript of the proceedings. The trial was unusually short but there is nothing in the record to indicate that it was illegally hastened. November 3, 1919, the jury returned a verdict of " guilty;" November 11th the defendants were sen-

tenced to be executed on December 27th; December 20th new counsel chosen by them or their friends moved for a new trial and supported the motion by affidavits of defendants and two other negroes who declared they testified falsely because of torture. This motion questioned the validity of the conviction upon the very grounds now advanced—torture, prejudice, mob domination, failure of counsel to protect interests, etc. It is thus summarized by counsel for appellants—

" The grounds urged in the motion were the state of public feeling against the defendants, the fact that the defendants and witnesses were frequently subjected to torture for the purpose of extracting from them admissions of guilt and to make them testify against the defendants; that they were given no opportunity to consult with their friends and seek assistance, or informed of the charge against them until after their indictment; that they were carried from jail to the courtroom without having been permitted to see or talk with an attorney or any other person in regard to their defense; that the court appointed counsel for the defendants without consulting them, or giving them an opportunity to employ their own counsel; that the state of public feeling was such that they could not have a fair jury; that the trial proceeded without their consulting with their counsel or any witnesses, or being given an opportunity to obtain witnesses; that they were never in court before and were entirely ignorant of what they could do to defend themselves; that the trial from beginning to end occupied three-fourths of an hour and the verdict was returned in from three to six minutes. Four of the defendants say that they never had a copy of the indictment served upon them, one had it only forty-eight hours before the trial.

"Another ground was that under the practice which prevailed in the State only white men were summoned

to sit on the grand jury or the jury, and that by this discrimination the defendants were deprived of their rights under the Constitution of the United States; that they had no notice or knowledge of what steps they should take to raise this point before the trial; that the verdict is contrary to the law and evidence.

" To this motion are attached two affidavits, one of Alf Banks, Jr., and another of William Wordlaw who testified to the fact that they were whipped, placed in the electric chair and strangled by something put in their noses to make them testify. These defendants did not suffer from what was done to these witnesses, as they did not testify at their trial, but their affidavits confirm the testimony of the others as to the treatment to which the Negroes in confinement were exposed."

A new trial having been denied, an appeal was granted to the State Supreme Court and sixty days allowed for preparing bill of exceptions; March 22, 1920, this appeal was argued orally and by briefs; March 29th the court announced its opinion, reviewed the proceedings and affirmed the judgment. *Hicks* v. *State,* 143 Ark. 158. A petition for rehearing was presented April 19th and overruled April 26th.

A petition for certiorari filed in this Court May 24, 1920, with the record of proceedings in the state courts, set forth in detail the very grounds of complaint now before us. It was presented October 5th, denied October 11th, 1920.

April 29, 1921, the Governor directed execution of the defendants on June 10th. June 8th the Chancery Court of Pulaski County granted them a writ of *habeas corpus;* on June 20th the State Supreme Court held that the Chancery Court lacked jurisdiction and prohibited further proceedings. *State* v. *Martineau,* 149 Ark. 237. August 4th a justice of this Court denied writ of error. Thereupon, the Governor fixed September 23rd for execu-

tion.   On September 21st the present *habeas corpus* proceeding began, and since then the matter has been in the courts.

It appears that during September, 1919, bloody conflicts took place between whites and blacks in Phillips County, Arkansas—" The Elaine Riot."   Many negroes and some whites were killed.   A committee of seven prominent white men was chosen to direct operations in putting down the so-called insurrection and conduct investigation with a view of discovering and punishing the guilty.   This committee published a statement, certainly not intemperate, about October 7th, wherein they stated the " ignorance and superstition of a race of children " was played upon for gain by a black swindler, and told of an organization to attack the whites.   It urged all persons white or black, in possession of information which might assist in discovering those responsible for the insurrection, to confer with it, upon the understanding that such action would be for the public safety and informant's identity carefully safeguarded.   I find nothing in this statement which counsels lawlessness or indicates more than an honest effort by upstanding men to meet the grave situation.

It is true that in October, 1920, almost a year after the trial here under consideration, the American Legion post at Helena—approximately three hundred ex-service white men—made protest to the Governor against commutation of the sentences.   It is copied in the margin as printed in the record.[1]   The Helena Rotary Club, November 10,

---

[1] " RESOLUTION.

" It has been brought to the attention of the Richard L. Kitchens Post, No. 31, American Legion, Helena, Arkansas, that the Governor is contemplating commuting the sentence of four of the negroes, who are now under death sentences for their participation in the Elaine Riot, to lesser sentences, and we, the members of this Post, feel that any action toward this end by the Governor would do more harm in

1920, expressed emphatic approval of this protest, and the Lions Club took like action. These resolutions are not violent and certainly do not establish the theory that defendants' conviction in November, 1919—a year before—was an empty form and utterly void; nor, as the

the community and breed lawlessness, as well as disregard for constituted authority, as at the time of this race riot the members of this Post were called upon to go to Hoop Spur and Elaine to protect life and property, and in compliance with this request, there were two American Legion members killed and one seriously injured, besides the other non-members who also perished, and when the guilty negroes were apprehended, a solemn promise was given by the leading citizens of the community, that if these guilty parties were not lynched, and let the law take its course, that justice would be done and the majesty of the law upheld.

" The twelve negroes now under sentence of death, but whose sentences are suspended—account of court procedure, and six of these negro cases have—taken to the Supreme Court of the United States, which court declined to review. The other six cases, whose original trials were reversed and new trials given them, were convicted, and their cases were appealed to the Supreme Court of the State and attorneys of their own selection were permitted to handle their cases.

" Now therefore be it resolved by this Post assembled on this the 19th day of October, 1920, that we most earnestly protest against the commutation of any of the sentences of these twelve negroes convicted of murder in the Elaine riot of October 1919, their having received a fair trial and—proven guilty, and the leniency of the court was shown in the balance of the cases tried, these being the ring leaders and guilty murderers, and that law and order will be vindicated and a solemn promise kept.

" Be it further resolved that a committee of four be appointed by the Post Commander. This Committee is hereby empowered to represent this Post at a conference, or several conferences, with the Governor of Arkansas and to take such steps as they may deem necessary to carry out the wishes of this resolution and leaving nothing undone to have these sentences carried out. This committee to report in full to the next meeting of this Post.

" Passed unanimously 8:30 P. M. October 19, 1920, basement of the Episcopal Church, Helena, Arkansas."

petition recklessly alleges, do they "further and conclusively show the existence of the mob spirit prevailing among all the white people of Phillips County at the time petitioners and the other defendants were put through the form of trials and show that the only reason the mob stayed its hand, the only reason they were not lynched was that the leading citizens of the community made a solemn promise to the mob that they should be executed in the form of law."

The Supreme Court of the State twice reversed the conviction of other negroes charged with committing murder during the disorders of September, 1919. The first opinion came down on the very day upon which the judgment against petitioners was affirmed, and held the verdict so defective that no judgment could be entered upon it. The second directed a reversal because the trial court had refused to hear evidence on the motion to set aside the regular panel of the petit jury. *Banks* v. *State,* 143 Ark. 154; *Ware* v. *State,* 146 Ark. 321. The Supreme Court, as well as the trial court, considered the claims of petitioners set forth by trusted counsel in the motion for a new trial. This Court denied a petition for certiorari wherein the facts and circumstances now relied upon were set out with great detail. Years have passed since they were convicted of an atrocious crime. Certainly they have not been rushed towards the death chair; on the contrary there has been long delay and some impatience over the result is not unnatural. The recent execution of assassins in England within thirty days of the crime, affords a striking contrast.

With all those things before him, I am unable to say that the District Judge, acquainted with local conditions, erred when he held the petition for the writ of *habeas corpus* insufficient. His duty was to consider the whole case and decide whether there appeared to be substantial reason for further proceedings.

Under the disclosed circumstances I cannot agree that the solemn adjudications by courts of a great State, which this Court has refused to review, can be successfully impeached by the mere *ex parte* affidavits made upon information and belief of ignorant convicts joined by two white men—confessedly atrocious criminals. The fact that petitioners are poor and ignorant and black naturally arouses sympathy; but that does not release us from enforcing principles which are essential to the orderly operation of our federal system.

I am authorized to say that MR. JUSTICE SUTHERLAND concurs in this dissent.