**UNITED STATES ex rel. PALMER et al. v. ADAMS, Governor of Colorado, et al.**

District Court, D. Colorado, at Denver.

No. 8634.

1. **Constitutional law ⟨key⟩321—Setting aside constitutional guaranties is not warranted merely by commission of crime.**

Mere commission of crime does not justify extraordinary remedies or setting aside of constitutional guaranties.

2. **Constitutional law ⟨key⟩255—Arrest and detention of petitioners without charges by state militia under order from Governor to suppress insurrection violated petitioners' constitutional rights, entitling them to habeas corpus, where civil government was not suspended (28 USCA § 461; Const. Amend. 14).**

Arrest and detention without charges of petitioners by state militia under order of Governor to take steps to suppress insurrection *held* unauthorized and in violation ₒof due process of law under the Fourteenth Amendment of the Federal Constitution, entitling petitioners to release on writ of habeas corpus under 28 US

CA § 461, where local civil officials and government continued to function, notwithstanding alleged lawless conditions due to strike.

Application by the United States, on the relation of Frank L. Palmer and others, for writ of habeas corpus to secure petitioners' release from custody, opposed by William H. Adams, Governor of the state of Colorado; and Paul P. Newlon, Adjutant General of the State of Colorado. On petitioners' demurrer to the return. Demurrer sustained, writ granted, and prisoners discharged.

**Colloquy.**

The Court: You claim that the Governor has declared a state of martial law in the district?

Mr. Roach: He did not expressly declare a state of martial law to exist. He said an insurrection existed, which the local authorities could not cope with. Neither did Governor Peabody in the Moyer Case say that martial law existed. He merely said that an insurrection existed.

The Court: Do you claim martial law does exist?

Mr. Roach: Well, qualified existence of martial law does exist. As I stated Wednesday, which I think is correct, martial law is a status. It does not depend upon the condition.

The Court: Irrespective of·whether the Governor in so many words said that, do you attempt to justify what is going on in Weld and Boulder counties on the ground that those counties are under martial law, and therefore subject to the rules of law applicable to such a condition, or just simply that, irrespective of that, on account of the so-called insurrection, you are justified in the conduct that is complained of?

Mr. Roach: Yes; I think that the existence of the insurrection itself and the actual presence of troops to suppress it justifies this. Now, in the Moyer Case, which Judge Lewis quotes from with apparent approval, it expressly appears from the opinion that Governor Peabody had not declared martial law, and yet they said that in suppressing the state of insurrection the Governor will retain persons, if he honestly believes they participated in the insurrection. In that opinion they said no martial law prevailed.

The Court: They do not even say the Governor had a constitutional right to declare martial law.

Mr. Roach: No; they say, whether it was, was immaterial; that he had the right to arrest and·retain persons who appeared to be participating in the insurrection. Likewise

in the opinion of Justice Holmes the words "martial law" are not used.

The Court: Do you claim that military rule is in the saddle up there?

Mr. Roach: Oh, no; we do not claim that. We claim that in a sense there is military rule up there; that they are authorized and have the right to go there, where there is a situation which the local authorities cannot cope with. The Governor did not in this case, nor did Governor Peabody, close the courts, or anything of that kind. He simply took the steps he deemed necessary to deal with the existing state of things as he found it.

The Court: Do you claim two powers are existing there side by side; the civil authorities and the local courts, sheriffs and peace officers, and, besides them, there is another government existing, to wit, the military power, if Mr. Newlon cares to exercise the power vested in him; that the people in that community are subjected to two jurisdictions or governments?

Mr. Roach: Not quite that. We do not want to be made to appear as being arbitrary in this matter. I would not say that to the extent Colonel Newlon sees fit, but to the extent the conditions demand. We do not claim the right to exercise any arbitrary power on the part of the Governor, or Colonel Newlon, or the militia. We do claim they have a right to act upon the appearances as they appear at the time.

The Court: Do you contend that any of these prisoners—if charges were made against them—I presume they would not be here, unless they had committed violence, or were guilty of some act of violence, justifying their arrest. Do you claim it would be impossible, on account of this state of insurrection, to go into the state court and give those men a trial?

Mr. Roach: If charges were filed against them in the ordinary way, they could give bond, be released, and continue their activities.

The Court: Do you mean to say that they would not be promptly tried in the manner prescribed by the Constitution and laws of Colorado? Suppose you think they have been guilty of assault, or violating the picketing law of this state, or any other criminal law. Do you say it would be unavailing to file an information in the state court of that county and proceed to a prompt trial, and that in case of their conviction they would not be sent to the penitentiary?

Mr. Roach: We contend that the Governor believes, and with reason, that the ordinary course of civil process would not be adequate to cope with that situation. They could be released on bail, and, if arrested again, they could get out on bail.

The Court: They would have to go to trial, would they not? Then they would not be out.

Mr. Roach: They would be out pending the trial, so far as that goes.  *  *  *

The Court: What would you say as to my question as to whether two forms of government exist side by side in these towns?

Mr. Perry: I believe there are. I believe the civil government is existing by virtue of the fact that the military government has not seen fit to supersede it.

The Court: Do you believe you could close up the court?

Mr. Perry: I believe we could. The order specifically says: "You shall use such means as you see fit, acting independently and in conjunction with"—

The Court: Is not it a fact that the courts of that county are open?

Mr. Perry: Yes, sir.

The Court: By permission of Colonel Newlon, or independent of Colonel Newlon?

Mr. Perry: I believe at this time they are acting by virtue of the authority which they have because he has not chosen at any time to supersede that authority.

The Court: In other words, he has the power, you think, under the order of the Governor, to say what offenders in those counties shall be tried by the state court, and what offenders shall be held by him without trial and without charge under the particular conditions?

Mr. Perry: I don't know whether that could really be answered. In this particular case—the only real interest to him—he has decided that these are the people who have done the things which have caused the military forces to come up; that there is no adequate remedy in the event they are placed in the state court.

The Court: What have they done?

Mr. Perry: In accordance with the return, it says they have been active in fomenting and keeping alive the insurrection.

The Court: Anything else?

Mr. Perry: No, sir; I think not.

Guy D. Duncan, of Denver, Colo., R. W. Henderson, of Bakersfield, Cal., and Floyd F. Miles, Carle Whitehead, and Albert L. Vogl, all of Denver, Colo., for petitioners.

W. L. Boatright, Atty. Gen., Charles Roach, Asst. Atty. Gen., and Lewis De R. Mowry and William O. Perry, both of Denver, Colo., for respondents.

SYMES, District Judge. The petition in this case is rather voluminous. It contains a good deal of irrelevant matter, and brings before the court the fact that a grave industrial conflict has existed in this state for some time. Such conflicts are to be deplored. This strike has been fomented by a type of irresponsible agitators with whom the court has absolutely no sympathy. They advocate doctrines that are irreconcilable with the principles of our Constitution and economic organization, and which, if allowed to prevail, means the destruction of the American government. An armed clash occurred in Weld county, and the ordinary officers of the law, showing every restraint possible, were finally forced to fire, killing and wounding a few of the misguided men urged on by agitators from outside our borders. The officers were fully justified, and the court commends their attitude in forcibly resisting a mob attempting to invade private property. Anything that can be done by lawful means to deal with such agitators, who are to blame, rather than the misguided men who allow themselves to be badly led, should meet with the approval of every law-abiding citizen. I have no sympathy with that organization, its principles or leaders. So far as I am informed, they do not work in the mines, never did an honest day's labor, but, on the contrary, live by fomenting of trouble. They are astute enough to step out of the way when any real clash with the authorities occurs, leaving the results to be borne by their misguided followers. These remarks, however, are not pertinent to the issues of the case.

The right of the petitioners to apply to this court for a writ of habeas corpus cannot be doubted. The issue presented by the return involves a grave federal question. It is not whether petitioners' rights under the state Constitution have been violated, but has due process of law been accorded them under the Fourteenth Amendment of the Constitution of the United States. The statute says (section 461, United States Code; 28 USCA § 461), that on the return to the writ the court or the judge shall proceed in a summary way to determine the facts of the case, hear the testimony and arguments, and thereupon dispose of the matter as law and justice require. Respondents have offered no evidence. The duty of the court is fully elaborated in the Royall Case, 117 U. S. 241, 6 S. Ct. 734, 29 L. Ed. 868, and the Moore Case, found in 261 U. S. 86, 43 S. Ct. 265, 67 L. Ed. 543, which went up from this circuit. In the latter case defendants were indicted and tried for murder. All their rights were apparent-ly exercised at the trial; that is, a jury impaneled, argument had, and testimony taken, followed by conviction, appeal, and sentence to death. Thereafter it was represented to the local United States court that the trial was a mockery, because a mob was in control of the situation, surrounding the courthouse; that the jury was intimidated and the whole proceedings carried on under the pressure of this unlawful assembly. The United States Supreme Court said, in passing upon a demurrer to these facts, that in view of the nature of the allegations it was the duty of the federal court to investigate and see whether or not there was due process of law, irrespective of the form that had been observed. It sent the case back to the lower court, with directions to investigate the facts.

Now, what situation is presented here, eliminating the allegations that are not material? Practically an agreement of facts that the Governor of the state called out the state militia, and sent them into these two counties under the executive or military order referred to, which vested in their commander authority to suppress the alleged insurrection by whatever means he in his good judgment deemed best. The order was not attested by or filed with the secretary of state, as state papers are, nor issued as a proclamation. It was issued direct to the adjutant general.

It is agreed that no attempt was made to declare martial law, to suspend the writ of habeas corpus, or to put aside the civil authorities of the two counties. It has never been decided that the Governor of Colorado has the right to declare martial law. That question was not passed upon in the Moyer Case, 35 Colo. 159, 85 P. 193, 12 L. R. A. (N. S.) 979, 117 Am. St. Rep. 189; Id., 35 Colo. 154, 91 P. 738, and has not been decided in any case cited. It is immaterial, however, because the state's counsel, with commendable frankness toward the court, admit that martial law has not been declared and does not exist in these two counties. They concede that the state courts in the affected district are functioning the same as before this alleged emergency arose, and as they are in other parts of the state; that criminal trials are taking place, offenders being convicted, and all the ordinary processes of local civil government going on unimpeded. So we have this situation: Alongside of the regular form of government, a body of 35 militiamen, acting under this order and performing their duties as men who wear the uniform should, are exercising arbitrary power, arresting people and holding them without charges, as the court is informed, that they have violated

the law, committed any act of violence, or resisted or defied the peace officers of the state. The return does not set forth a single fact to enlighten this court as to conditions that formerly or now exist in the two counties in question. It simply alleges that in the exercise of 'honest judgment the Governor deems it for. the best interests of the community, and the preservation of law and order, to detain the petitioners without filing charges, admitting them to bail, or intent to submit them to a military or the local court for hearing and trial.

So we have presented this proposition for decision. The Governor has the power to grant at will a roving commission to a body of state militia to go into any part of the state that he may see fit, arrest and detain citizens, and deprive them indefinitely of their liberty and the rights guaranteed them by the Federal Constitution, actuated, as in this case, by the best of motives. It is admitted the soldiers have not attempted to set aside the local state government, or take over the courts, but simply that they have the right to set up a separate and independent government or tribunal, make arrests in such cases as they may see fit to handle, and do such acts as in their uncontrolled discretion are necessary to suppress what they claim is an insurrection, regardless of the courts and the Constitution. It is not stated what the insurrection or the cause of it is. The fact has been drawn to our attention that, as the result of a riot the state police, not the militia, used firearms to protect property and the right of men who wanted to work; that that situation was promptly and effectively handled, by the state police, without the aid of the militia, and without declaring martial law. In other parts of the state, where the strike exists, arrests are being made and the prisoners turned over to the state court, where, as we are advised, they are being promptly convicted or acquitted, as the facts of each case warrant.

[1, 2] The mere commission of crime does not justify extraordinary remedies or setting aside the constitutional guaranties. If it did, perhaps the city of Chicago would be to-day under martial law. If the Governor here had declared martial law, we would have an entirely different situation. All the rules applicable thereto, which this court and others are bound to recognize, would come into play. We would know how to proceed, how far the functions of the court and civil authorities were abrogated. That is not the case. The situation presented is without a parallel on the facts outside Colorado. It

seems to me there either must be martial law or no martial law, and, until there is, no rogatory body can lawfully go around in this state, depriving individuals of the rights that the Constitution, both state and federal, guaranties. We have either one thing or the other. The two cannot exist side by side. This quotation from the much-discussed Milligan Case (4 Wall. 2, 18 L. Ed. 281) becomes pertinent:

"It follows, from what has been said on this subject, that there are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, then, on the theater of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. *As necessity creates the rule, so it limits its duration; for, if this government is continued after the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction.* It is also confined to the locality of actual war."

While the legal controversy which raged in 1861 between the President and the Supreme Court over the right of the former to suspend the writ of habeas corpus has never been judicially settled, yet the duty of the federal court to issue the writ and to consider the legal questions involved is now fully admitted. Lincoln, even though upholding the powers he exercised as President, justified them on the ground of the necessities of a state of war then actually in existence, and that such action was only constitutional in case of rebellion. And shortly thereafter, in the Milligan Case, the Supreme Court denounced as highly illegal the existence of military tribunals in states where the civil courts were open.

In my opinion, the state authorities must take one of two positions: Either that martial law is justified and declared, and the territory taken over, and the civil power made subordinate to the military, or else they must recognize the civil power, and allow it to deal with the situation. I cannot see any middle ground. I am not saying that the facts would not justify the Governor in declaring martial law, or that he could be called to account if he so declared.

Petitioners are claiming rights under the

Federal Constitution, and I have been unable to find a case where the federal courts have recognized the right of a small body of militia, without declaring a status different from that here presented, to arrest and detain citizens at will, without filing charges, especially where it is admitted that the courts and civil authorities have not been interfered with, overthrown, or supplanted by the military forces. In the cases cited, decided by my predecessors, it was established as a fact that local officials and government had ceased to function, and that two unlawful armed bodies were contending for supremacy.

To admit that the Governor of a state can lawfully do these things is to say that a state officer can, in his uncontrolled discretion and without a showing of any kind, set aside the Bill of Rights of the Federal Constitution. If so, it logically follows that the protection of the Fourteenth Amendment is a matter of favor only, depending on the whim of the Governor, and not an absolute right.

The executive is vested with large discretion in such matters, and courts cannot inquire into the degree of necessity or substitute its judgment for that of the Governor. But there must be a limit somewhere. Otherwise we have a government of men and not of laws. As said in the Milligan Case:

"It will be borne in mind that this is not a question of the power to proclaim martial law, when war exists in a community and the courts and civil authorities are overthrown. Nor is it a question what rule a military commander, at the head of his army, can impose on states in rebellion to cripple their resources and quell the insurrection."

And in that case, as counsel has urged here, attention was called to the fact that the circuit court was meeting; that it needed no bayonets to protect it, and required no military aid to execute its judgments. Likewise, there is no assertion made by counsel that anybody committing a crime in Boulder or Weld counties would not receive punishment in the state courts. They are engaged in the trials of offenses, and, as in the Milligan Case, have never been interrupted.

A very eminent English authority has said in respect to the use of martial law—and I refer to martial law, because the situation is somewhat analogous:

"The use of martial law under the prerogative of the crown 'can only be tolerated because, by reason of open rebellion, the enforcing of any other law has become impossible.' 'When the regular courts are open, so that criminals might be delivered over to them to be dealt with according to law, there

26 F.(2d)—10

is not, as we conceive, any right in the crown to adopt any other course of proceeding. Such power can only be conferred by the Legislature.' 'Martial law can never be enforced for the ordinary purposes of civil or even criminal justice, except in the latter so far as the necessity arising from actual resistance compels its adoption.' "

An interesting discussion is found in United States v. Lee, 106 U. S. 196, 1 S. Ct. 240, 27 L. Ed. 171. While it is not in point here, it is very illuminating. A son of General Lee sued to recover possession of 1,100 acres of land known as the Arlington estate, which was bid in by the United States government at tax sale, and was in its possession and under the control of the defendants, military officers, by order of the President. It was contended in behalf of the United States that the property belonged to the government, and was in the actual possession of its officers, and therefore the courts had no jurisdiction. Judge Miller said:

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it."

' "Shall it be said," he asked, "that the courts cannot give remedy when the citizen has been deprived of his property by force, his estate seized and converted to the use of the government without any lawful authority, without any process of law and without any compensation, because the President has ordered it and his officers are in possession?"

Likewise can a citizen be deprived of his liberty because the Governor of a state orders it, and his military officers have him in their custody?

I am not unmindful, as I have already stated, of the efforts that have been made by the officers of the law and the Governor to deal with a situation created by those for whom we can have no sympathy. These emergencies generally result from the failure of local officers to carry out their oath of office. The small body of state police did in this situation what could easily have been done by every sheriff in this state. If they had cared to perform their sworn duty, we would not have had a strike. But, be that as it may, it does not justify a resort to illegal methods. All we can do when such a case comes here is to examine the authorities, determine what the law is, and afford every citizen the rights granted to him by the Con-

stitution of the United States, irrespective of all other considerations.

.It follows from what I have said that the demurrer to the return will have to be sustained, the writ granted, and the prisoners discharged.