**DOWNER v. DUNAWAY, Superintendent of Georgia State Penitentiary, et al.**

District Court, M. D. Georgia, Macon Division.

Dec. 15, 1932.

Park & Strozier, of Macon, Ga., and W. A. Sutherland, A. T. Walden, and Granger Hansell, all of Atlanta, Ga., for petitioner.

John I. Kelley and T. R. Gress, Asst. Attys. Gen., A. S. Skelton, of Hartwell, Ga.,

and Paul Brown and Clark Edwards, Jr., both of Elberton, Ga., for respondents.

DEAVER, District Judge.

John Downer was convicted in the superior court of Elbert county, Ga., of rape, and was sentenced to be electrocuted on the 15th day of June, 1931. On the 13th day of June, 1931, through his counsel, he presented to this court a petition for the writ of habeas corpus, alleging that he had been denied due process of law under the Fourteenth Amendment of the Constitution of the United States. This court refused to grant the writ, but made a certificate of probable cause so as to enable the petitioner to have the sufficiency of his petition passed upon by the Circuit Court of Appeals. The case was appealed. The Circuit Court of Appeals reversed the lower court, 53 F.(2d) 586, 588, and held that the facts stated in the petition were sufficient to demand the grant of the writ, and remanded the case to this court for a hearing as to the truth of the allegations made.

This court set the case for hearing on the 5th day of July, 1932, and the respondent, B. H. Dunaway, upon notice, produced the body of the petitioner in court at the hearing. D. H. Dunaway filed a response. The state of Georgia, through its Attorney General, appeared, and, upon its application, was, without objection, made a party. The hearing was had.

At the conclusion of the evidence counsel asked permission to file written briefs. The state filed its brief on the 29th day of October, 1932, and petitioner filed his brief on the 2d day of November, 1932. Thereupon the Attorney General of Georgia requested time to file a reply brief, which was filed on the 6th day of December, 1932.

The petition, as summarized by the Circuit Court of Appeals, alleged: "Appellant Downer was in the custody of appellee Dunaway, as superintendent of the Georgia State Penitentiary, under sentence that he be electrocuted on June 15, 1931, two days later. That sentence was imposed upon appellant by the superior court of Elbert county, Ga., upon a verdict that found him guilty of the crime of rape. On May 17, 1931, so it is supposed, that crime was committed upon a white woman near the city or town of Elberton in Elbert county. Appellant is a negro man. On the 18th four negroes other than appellant were arrested and held in jail as suspects, and on that day a mob of from 1,000 to 1,500 people surrounded the jail. Early on the 19th the mob had become so threaten-

ing that the officers placed those negroes in automobiles and rushed them away to Athens to prevent them from being lynched. The mob became so enraged at this action that it pursued the officers and fired a number of shots into the automobiles carrying them and their prisoners. On the 19th appellant and another negro named McCalla were also arrested and placed in jail at Elberton. A mob again gathered at the jail, overrunning the square in front of it and the courthouse, forced its way into the sheriff's quarters on the ground floor and up the stairs to the floor on which the jail was located, and attempted to break down the door leading into the cell where McCalla and appellant were imprisoned. By that time the Governor had ordered out the local National Guard troops, and they immediately gathered at the jail and began attempting to dispel the mob. As soon as it became dark the mob increased to not less than 1,500 people, constantly threatened to break into the jail and lynch appellant and McCalla, and members of it did actually break into the sheriff's quarters and force their way up the stairs leading to the jail, where they were stopped by the firing of a machine gun. One member of the mob was injured and threats were made against the lives of the National Guardsmen who were manning the machine gun. For more than six hours the mob stormed and threatened, fired shots into the jail, smashed windows, threw dynamite, and threatened to blow up the jail. The arrival of more troops made it possible for appellant and McCalla, disguised in National Guard uniforms, to be secretly placed in automobiles and taken to the Fulton county jail in Atlanta. On the 25th a special term of court was convened solely for the purpose of indicting and of trying the person alleged in the indictment to be guilty of the crime for which appellant was being held. A grand jury was immediately organized and on that day found an indictment against appellant for the rape. On the 26th he was tried, convicted as charged in the indictment, and sentenced to death. The trial began at 10 o'clock in the morning; the verdict was rendered at 10 o'clock that night, after the jury had been out about five minutes. The court at once pronounced sentence, and appellant was immediately taken charge of by troops and returned to the jail in Atlanta. Appellant had no funds with which to employ counsel, and first met counsel appointed by the court about an hour before the trial. He had no opportunity after the trial to consult with his counsel before the adjournment of court, which occurred on the

27th at noon. No motion was made for a continuance, or change of venue, although during the trial a large and unruly crowd of people congregated in the courthouse square. No motion for a new trial was made by appellant's counsel before adjournment or afterward. During the trial two hundred officers and men of the National Guard attempted to keep order. If it had not been for their presence in and about the courtroom, it would have been impossible to hold the trial, and appellant would have been lynched. If he had been acquitted he would not have been permitted by the mob to leave the courtroom without the protection of the troops. The same spirit of mob violence obtained from the date of the commission of the crime until after the trial. During that time a number of negroes had been beaten without provocation by white men. Counsel was prevented from moving for a continuance, for a change of venue, or for a new trial by the fear of mob violence. Finally, the petition alleges that appellant was innocent of the crime of which he was convicted."

Counsel for petitioner made the following statement: "If your Honor please, we stated by allegation in the petition on information and belief that certain members of the grand jury and traverse jury empaneled to try this defendant were members of the mob. We notified, rather were notified, by counsel for the State that it would be necessary for them to bring the entire panels of both juries in order to meet the proof on that point. We have agreed to abandon that allegation, and, therefore, no proof will be offered by either side that members of the juries were members of the mob."

There is a conflict in the opinions of the witnesses as to whether the trial was fair and impartial, but the real facts are not so much in dispute. Without restating the testimony of all the witnesses, it is sufficient to say that, with the exception of the abandoned allegation, the stipulations made by counsel, together with the evidence adduced at the hearing, substantially support the allegations of the petition.

In view of all the facts, considered in the light of the decision of the Circuit Court of Appeals in this case, Downer v. Dunaway, 53 F.(2d) 586, and of the decisions of the Supreme Court of the United States in the case of Moore v. Dempsey, 261 U. S. 86, 43 S. Ct. 265, 67 L. Ed. 543, and the cases of Ozie Powell et al. v. State of Alabama, Haywood Patterson v. State of Alabama, and Charley Weems et al. v. State of Alabama,

53 S. Ct. 55, 77 L. Ed. ——, consolidated and decided as one case by that court on November 7, 1932, there can scarcely be any doubt that the petitioner was denied due process of law in violation of the Fourteenth Amendment of the Constitution.

On the day of the trial, it is true, according to the evidence, there was no mob violence or disorder of any kind. But it is also true that there was no opportunity for any outbreak, because the military forces had the entire town, including the courtroom, completely in charge. Moreover, in the opinion of some of the witnesses, there would have been a lynching on that day instead of a trial but for the presence of the troops. In fact, the troops were there; and, of course, it is impossible to know with absolute certainty what would have happened if they had not been there. However, in so far as it is possible to deduce a logical result from known conditions, it is not an unreasonable conclusion to say that very probably the opinion of the witnesses was correct.

In the main, the people of this state are opposed to lawless outbreaks, and desire to see justice done in a fair and legal manner. Elbert county is no exception. The thing that happened in that county could just as well have happened in any other county. Indeed, according to the evidence, the majority of the mob in this instance actually came from other counties. The right-thinking people of Elbert county, who had any connection with the case, did all they could to prevent mob violence.

Mob violence was prevented. Just how much the promise of a special term of court and a speedy trial contributed to that end is speculative. It may have had some influence in delaying the activity of the mob until adequate protection for the prisoner could be secured. On the other hand, the local members of the National Guard might have been able to protect the prisoner until reinforcements arrived. It has been said, though not by counsel, that some well-meaning persons think the sentence of death should be carried out for the reason that the trial, whether legal or not, prevented a disgraceful lynching, and that a discharge of the petitioner on habeas corpus might in the future cause like mobs to take the law into their own hands. That view is untenable, because it overlooks both the duty of courts and the importance to the people of preserving inviolable the due process clause of the Constitution. Even if the promise of an early trial alone actually prevented a lynching, courts cannot rightfully regard that fact as a sort of estoppel against affording to the petitioner the right guaranteed to him by the Constitution. The Constitution says that no person shall be deprived of life, liberty, or property without due process of law. It contains no provisos, limitations, or exceptions. It does not say that no person shall be deprived of life, liberty, or property without due process of law, except when a mob will not permit the courts to afford due process, or unless courts, by dispensing with due process, can prevent a lynching, or provided due process can be had without any harmful attendant circumstances. Courts did not make the Constitution, and they have no right to add anything to it or to take anything from it. Courts are controlled by the Constitution. If they act at all, they must act in accord with its mandates and within its limitations. The Constitution is the foundation of our government, and the right-thinking people of this State, including those in Elbert county, stand ready to uphold it, and would be among the first, if necessary, to give their lives to preserve it. The people, not the courts, placed the due process clause in the Constitution, and it is safe to say that no citizen who has a proper conception of our system of government would consent to have it ignored or evaded.

There is more involved in this case than the life of one lowly citizen. The people of this country have declared that no person shall be deprived of life, liberty, or property without due process of law, and the loyal, law-abiding citizens expect that provision to stand as a protection to each one of them. If it may be ignored in one case, it may be ignored in any other case; and, when it becomes ineffective through disregard or evasion, one of the most important rights of the people is destroyed.

An order will be made on the 23d day of December, 1932, discharging the petitioner. Due notice will be given to the state of the proposed order and its date; and opportunity will be afforded for the state, if it so desires, to take the petitioner into custody for such further proceedings as may be thought proper.