## UNITED STATES v. KAPLAN.
### Cr. A. No. 101–94.

United States District Court
S. D. New York.
Nov. 14, 1951.

8

Irving H. Saypol, U. S. Atty., New York City, Bruno Schachner, Asst. U. S. Atty., New York City, of counsel, for plaintiff.

Samuel W. Altman, New York City, for defendant.

WEINFELD, District Judge.

The defendant, now on probation following the expiration of a twelve year sentence, moves to set aside the judgment of conviction and to vacate the sentence. The Court has conducted a hearing pursuant to Title 28 U.S.C. § 2255.[1]

The defendant was convicted in this Court on September 6, 1938, on all seven counts of an indictment charging the sale and possession of narcotics and conspiracy. He was sentenced to twelve years imprisonment, fined $2,500, of which $500 was remitted, and placed on five years' probation to follow the prison term. The conviction was affirmed by the Court of Appeals on March 20, 1939.[2] The defendant served six years in prison, was released on conditional parole for the remaining six years and is currently on probation until June 1956.

The indictment was the second in chronological order of three indictments, all based on the same facts—possession and sale of narcotics on two occasions.

The first indictment, filed on April 23, 1937, charges one Hyman and another, Levine, with two sales of heroin to one Edward A. Murphy, a Government Agent, on March 13, 1937, and March 26, 1937. The indictment also contains a conspiracy count.

The second indictment, filed on September 28, 1937, on which the defendant was convicted, names Nathan Kaplan, alias " * * * 'Kitty' " as the sole defendant, and also names Hyman and Levine as co-conspirators but not as defendants. It is identical in phraseology with the first indictment except for the overt acts in the conspiracy count.

The third indictment, filed on January 5, 1938, names Max Kaplan, "alias Brownsville Kitty" and the defendant herein, Nathan Kaplan, alias " * * * 'Kitty,' " as well as two other defendants. The substantive counts are the same as those in the first two indictments, although the conspiracy count and the overt acts differ.

Upon the trial, Nathan Kaplan, the moving defendant, and Max Kaplan, named in the third indictment, were referred to under the same aliases, "Kitty" or "Kitty Kaplan."

The conviction was based principally upon the testimony of one Laura Miller, a Government informer, with a record for prostitution and possession of narcotics, Murphy, the Government Agent, to whom the sales were made, and another Government Agent. The evidence disclosed that some six years before the acts alleged, Laura Miller had known a "Kitty" Kaplan, admittedly not Nathan Kaplan, the moving defendant, who had supplied her with narcotics. In February 1937, while acting as a Government informer, she left a message for the "Kitty" Kaplan she knew, at a drug store, formerly owned by the brother of that "Kitty" Kaplan, and a few days later, February 26th, received a telephone call from a man who said he would call on her. She claimed that the following day, Nathan Kaplan, the moving defendant, came to her home, discussed the purchase of narcotics and told her he would send two men to visit her. According to her testimony this was the first time she had ever seen Nathan Kaplan.

She further stated she next heard from the defendant by telephone on March 7th, when he again informed her that two men would visit her that day; that Hyman and Levine came to her apartment that day and returned there on March 12th, when she introduced them to Agent Murphy. They returned on March 13th, when Murphy ordered seven ounces of heroin from them. Delivery was made the same day. She also testified that the defendant again called on her on March 23rd. Thereafter, Hyman and Levine made a second sale of narcotics to Agent Murphy, at which time they were arrested.

Murphy and his fellow Agent both testified they had observed the defendant at the Miller apartment and also saw him entering or leaving the apartment house, to which he had driven in a Plymouth car. Another witness, a convicted prostitute, who shared an apartment with Laura Miller, also identi-

---

1. United States v. Paglia, 2 Cir., 190 F. 2d 445.

2. United States v. Kaplan, 2 Cir., 102 F. 2d 1019.

fied the defendant. On cross-examination she admitted being under the influence of narcotics while on the witness stand.

The defendant did not take the stand.

At the trial, and also upon appeal, the defense vigorously contended that Max Kaplan, alias "Kitty," then a fugitive, was the perpetrator of the crime charged and that it was he, and not Nathan Kaplan, who had called on Laura Miller on both occasions and had been observed by the Government Agents.

Hyman and Levine were serving prison sentences at the time of trial, having pled guilty to the first indictment. They were brought here to testify on defendant's application pursuant to writs ad testificandum. Each swore that until the moment of his testimony he had never seen or heard of the defendant Nathan Kaplan; that he was not the person who had sent them to Laura Miller's apartment. Both denied knowing Max Kaplan, alias "Kitty" Kaplan. However, when pressed to name Max Kaplan, alias "Kitty" Kaplan (who, as already noted, was a fugitive) as the person who had sent him there, Levine remained mute but acknowledged that he did not want to be regarded as a "squealer."

Thus, mistaken identity was the central issue; the jury accepted the Government's version, rejected the contention of the defense, and found that the prosecution beyond a reasonable doubt had established its case.

The defendant now advances the same contention as on the trial, but submits the following additional evidence which was not presented, nor available, at the time of trial:

More than a year after Nathan Kaplan's conviction, Max Kaplan surrendered, pleaded guilty to the third indictment, and was sentenced on October 23, 1939, to a term of eighteen months, which he served. (A nolle prosequi on this indictment was entered as to the moving defendant in 1946.)

Max Kaplan was called as a witness upon the hearing on the present application. He swore that he had known Laura Miller some five or six years before the date of the offenses in the indictment; that he had then had transactions with her; that in 1937 it was he who had received Laura Miller's note, left at the drug store once owned by his brother; that it was he who had telephoned her and visited her apartment on both occasions named in the indictment; that he was the owner of the Plymouth car; that it was he who had sent Hyman and Levine there; that upon learning of their arrest he fled and secreted himself for almost two years until his surrender in 1939.

He stated that he had never seen or heard of Nathan Kaplan until 1940, when, while serving his sentence, he first heard that they had been convicted for the same crime. The information came to him from another inmate but he did nothing about it since it was hearsay and he "couldn't stick his neck out." He saw Nathan Kaplan while they were both in the same penitentiary but did not have a chance to speak with him.

It was not until 1950 that he first met Nathan Kaplan, then on conditional parole, and definitely learned of the latter's conviction for the very offense for which he, Max Kaplan, had also been sentenced and served time. At Nathan Kaplan's urging, Max Kaplan consulted his lawyer, and then with him presented to the Assistant United States Attorney who had prosecuted both defendants, substantially the facts which were sworn to at the hearing and urged correction of the injustice to Nathan Kaplan.

Hyman and Levine also testified at the hearing and reiterated the testimony they had given upon the defendant's trial, that they had never seen or heard of the defendant. However, they went beyond their former testimony this time and named Max Kaplan as the culprit and the one who had sent them to Laura Miller's apartment to effect the sale of the narcotics. Levine explained his former refusal to identify Max Kaplan, stating that it had been "against his code" to incriminate one man to save another. Agent Murphy adhered to his testimony upon the trial and stated his present belief that his original identification of the defendant was correct. No question is raised as to the honesty of the Government Agent but there is a serious question as to his

opportunity for precise observation. The others who identified the defendant at his trial were not called as witnesses.

At the Court's direction, the Assistant United States Attorney who presented the evidence which led to the indictments and also prosecuted Nathan Kaplan and received the plea of Max Kaplan, was called as a witness. An able prosecutor of more than twenty years' experience in the preparation and trial of narcotics cases, he expressed, with commendable candor, the view that Nathan Kaplan had been unjustly convicted or mistakenly convicted for Max Kaplan, "Kitty" Kaplan. His present opinion was based upon the following facts, unknown to him at the time of trial:

The prosecutor first learned in 1950, when Max Kaplan ("Kitty" Kaplan) called on him, that the address from which the fictitiously registered car seen at the Miller apartment was recorded, was the same address as that of the mother of Max Kaplan ("Kitty" Kaplan), and that the latter was a frequent visitor there; second, the prosecutor observed the striking resemblance between the defendant and Max Kaplan when the latter surrendered; third, he discovered that Laura Miller's note had, in fact, been delivered to Max Kaplan; finally, the prosecutor had not known of any connection between Max Kaplan and the visits to Laura Miller and the sale to the Agents. The indictments had been drawn on the theory that Nathan Kaplan made the sale directly, whereas Max Kaplan was the supplier and operator of a refinery from which the defendant Nathan Kaplan had obtained the drugs. Thus, under this view, Max Kaplan's culpability was only indirectly connected with the sales. The discovery that he, Max Kaplan, rather than the defendant

Nathan Kaplan, negotiated the sales negated the entire theory of the indictments. The prosecutor stated that if he had had this information at the time of trial, he would not have prosecuted or would have moved to dismiss the indictment.

The Court is persuaded that the prosecutor's view that an innocent man has been convicted is correct and that a grave miscarriage of justice has taken place. However, at the outset the Court is faced with the question of its power to grant relief.

## I

The defendant urges that by his conviction based upon improper or wrong identification, he was denied his constitutional right to due process of law. This contention necessitates consideration of Section 2255 of Title 28 of the United States Code, which provides that:

"A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

"A motion for such relief may be made at any time." [3]

The section is a codification of the common law writ of coram nobis [4] The remedy under the section is "declaratory of existing law." [5] The test is whether prior to the enactment of Section 2255, the issue was one which could have been raised on an application for a writ of habeas corpus.[6]

---

3. When the motion was made, defendant was a "prisoner in custody" even though on parole and not in prison. Anderson v. Corall, 263 U.S. 193, 44 S.Ct. 43, 68 L.Ed. 247; Factor v. Fox, 6 Cir., 175 F. 2d 626; 18 U.S.C.A. § 4203. The parole period expired by the time of the hearing and defendant is now on probation. He is, nevertheless, a "prisoner in custody." 18 U.S.C.A. § 3653; Dillingham v. United States, 5 Cir., 76 F.2d 35; United States ex rel. Carapa v. Curran, 2 Cir., 297 F. 946, 36 A.L.R. 877.

4. Reviser's notes to Section 2255.

5. Parker, C. J., Limiting the Abuse of Habeas Corpus, 8 F.R.D. 171, 175.

6. United States v. Meyers, D.C., 84 F. Supp. 766, affirmed 86 U.S.App.D.C. 320, 181 F.2d 802; Taylor v. United States, 4 Cir., 177 F.2d 194; Hastings v. United States, 9 Cir., 184 F.2d 939; Davilman v. United States, 6 Cir., 180 F.2d 284; Keto v. United States, 8 Cir., 189 F.2d 247. In effect, Section 2255 was designed to prevent the abuse of the reme-

The extent of the Court's jurisdiction and authority has been described in Howell v. United States, 4 Cir., 172 F.2d 213, 215, by Chief Judge Parker, the Chairman of the Judicial Conference Committee, which proposed Section 2255. "* * * It is elementary that neither habeas corpus nor motion in the nature of application for writ of error coram nobis can be availed of in lieu of writ of error or appeal, to correct errors committed in the course of a trial, even though such errors relate to constitutional rights. It is only when there has been the denial of the substance of a fair trial that the validity of the proceedings may be thus collaterally attacked or questioned by motion in the nature of petition for writ of error coram nobis or under 28 U.S.C.A. 2255."

■ The remedy, whether by habeas corpus or under Section 2255, is an extraordinary one. Upon such an application, the Court is not empowered to review the jury's determination of the facts or to correct errors committed upon the trial.[7] Its jurisdiction is limited to ascertaining whether there was a trial which was fair, not only in form, but in substance—whether, in short, there had been any failure "to observe that fundamental fairness essential to the very concept of justice."[8] Thus,

a judgment may be rendered void where there has been a denial of the right to counsel,[9] or where the assistance of counsel is "such * * * as to shock the conscience of the Court and make the [trial] a farce and a mockery of justice";[10] or where a plea of guilty was entered as a result of coercion,[11] or deception, by the prosecution;[12] or where there was mob domination at the trial;[13] or where the prosecution has failed in the duty that it owes to the defendant to refrain from methods that would corrupt the administration of justice as, for example, where the prosecution has knowingly used false testimony to secure a conviction[14] or has caused evidence to be suppressed.[15]

■ Tested by these standards, has the defendant been denied due process? He was defended upon the trial by a well-known lawyer, outstandingly experienced in criminal trials. Defendant concedes that the trial was conducted with the utmost fairness. He admits that the prosecution was fair throughout, that no facts were withheld by it and that it had no knowledge of the falsity of any of the testimony. The concession goes beyond this; the defendant admits that the prosecution was not aware of the facts now presented to this Court until their recent disclosure, and that at

dy of habeas corpus by requiring that collateral attack upon a conviction be made by a motion in the sentencing court where the facts and records are accessible rather than by habeas corpus in a distant forum. Birtch v. United States, 4 Cir., 173 F.2d 316; United States v. Gallagher, 3 Cir., 183 F.2d 342; United States v. Riccardi, 3 Cir., 188 F.2d 416; Pulliam v. United States, 10 Cir., 178 F.2d 777; Barrett v. Hunter, 10 Cir., 180 F.2d 510; Martin v. Hiatt, 5 Cir., 174 F.2d 350.

7. Meyers v. Welch, 4 Cir., 179 F.2d 707.

8. Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166.

9. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Mitchell v. Youell, 4 Cir., 130 F.2d 880.

10. United States v. Wight, 2 Cir., 176 F.2d 376, 379, certiorari denied 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586.

11. Waley v. Johnston, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302; Hurst v. United States, 10 Cir., 180 F.2d 835; Williams v. United States, 8 Cir., 177 F.2d 97.

12. Smith v. O'Grady, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859.

13. Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969; Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543.

14. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791; Hinley v. Burford, 10 Cir., 183 F.2d 581; James v. United States, 5 Cir., 175 F.2d 769.

15. In re Curtis, D.C., 36 F.Supp. 408, affirmed 75 U.S.App.D.C. 66, 123 F.2d 936; United States ex rel. Montgomery v. Ragen, D.C., 86 F.Supp. 382. Most of the examples cited arose on writs of habeas corpus. Since the same standards apply on a motion under Section 2255, they may properly be considered. United States v. Wight, supra. Although in some, relief was denied, the ground on which the attack may be made is indicated.

the time of the trial the prosecution believed that Nathan Kaplan was the proper defendant.

Defendant contends, however, that his conviction resulted from the use of perjured testimony. The evidence before this Court, however, fails to establish that the testimony was wilfully false.[16] The identification by the Government Agents may be explained as based on mistake, rather than deliberate falsity. But over and above all this, it is clear, as conceded by the defendant, that if there were perjury, the prosecution had no knowledge of it.

The Courts have thus far held with substantial unanimity that relief will not be granted under Section 2255 because of perjured testimony unless the prosecution knowingly and intentionally used such testimony to obtain a conviction.[17] For the granting of relief, the perjury must be "so entwined with other circumstances as to deprive the proceeding of its character as due process of law." [18]

No such circumstances are presented here. Nor is the judgment rendered void by the confession of Max Kaplan absolving the defendant of guilt.[19] Nor is the newly discovered evidence now brought to the attention of the prosecutor ground for relief under Section 2255,[20] although under appropriate circumstances it would be the basis for an application for a new trial.

The defendant's position is that in its totality the proceeding deprived him of his constitutional rights. However, he has not adverted to, nor has the Court discovered upon the evidence submitted, any impairment of any specific constitutional right or any unfairness upon the trial that would warrant a holding that due process has been denied.

## II

█ Essentially, the defendant is applying for relief upon the ground of newly discovered evidence. The Government concedes, and the Court agrees, that were the motion timely, the defendant would be entitled to relief upon this ground. However, this avenue is unfortunately closed since Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., requires that a motion for a new trial based upon newly discovered evidence "may be made only before or within two years after final judgment."

This time limitation, which has been rigidly enforced,[21] works a great hardship in this case, for it is difficult to see how some of the vital evidence now presented could have been available to the defendant during the two-year period. But the limitation was imposed by the Supreme Court after deliberation, although as first proposed by the Advisory Committee on the Rules of Criminal Procedure, Rule 33 was

---

16. 18 U.S.C. § 1621.

17. Mooney v. Holohan, supra. Hodge v. Huff, 78 U.S.App.D.C. 329, 140 F.2d 686, certiorari denied 322 U.S. 733, 64 S.Ct. 946, 88 L.Ed. 1567; Tilghman v. Hunter, 10 Cir., 167 F.2d 611; Wagner v. Hunter, 10 Cir., 161 F.2d 601, certiorari denied 332 U.S. 776, 68 S.Ct. 39, 92 L.Ed. 361; Hinley v. Burford, supra.

18. Hodge v. Huff, supra, 140 F.2d at page 688. In Jones v. Com. of Kentucky, 6 Cir., 97 F.2d 335, the Court set aside a death sentence resting upon perjured testimony, although the prosecution had been unaware of the perjury, but pointed out that the newly discovered evidence cast doubt upon the freedom from duress of the Government's witnesses and that, in addition, there was not adequate representation by counsel in that the counsel assigned to the case was not given sufficient time to prepare for a case of such seriousness.

19. Figueroa v. Saldana, 1 Cir., 23 F.2d 327, certiorari denied 277 U.S. 574, 48 S.Ct. 530, 72 L.Ed. 995; McGuire v. Hunter, 10 Cir., 138 F.2d 379; Hauck v. Hiatt, 3 Cir., 141 F.2d 812.

20. Reid v. United States, 5 Cir., 149 F.2d 334; Spaulding v. United States, 6 Cir., 155 F.2d 919; Meredith v. United States, 6 Cir., 138 F.2d 772; United States v. Gardzielewski, 7 Cir., 135 F.2d 271; Howell v. United States, supra; United States v. Riccardi, supra.

21. United States v. Smith, 331 U.S. 469, 67 S.Ct. 1330, 91 L.Ed. 1610; Oddo v. United States, 2 Cir., 171 F.2d 854, certiorari denied 326 U.S. 756, 66 S.Ct. 88, 90 L.Ed. 453. The time limitations of Rule 33 are jurisdictional. Marion v. United States, 9 Cir., 171 F.2d 185, certiorari denied 337 U.S. 944, 69 S.Ct. 1500, 93 L.Ed. 1747.

without restriction.[22] As interpreted by Chief Judge Parker in Howell v. United States, supra, 172 F.2d at page 216, this modification by the Supreme Court "not only shows a deliberate intention to limit to two years the time within which a new trial may be asked on the ground of newly discovered evidence, but also negatives any intention to equate this procedure with that having relation to relief for the deprivation of constitutional rights, which if it amounted to a denial of due process might be made the subject of motion * * * at any time" under Title 28 U.S.C. § 2255.

### III

In the unusual circumstances of this case, the Court feels that it would be shirking its responsibility if the denial of the motion were made without further comment.

Upon the evidence, the Court, if it had the power, would set aside the conviction since, as the United States District Attorney now acknowledges, the facts now known nullify the theory upon which the defendant was convicted and render that conviction erroneous and unjust. It is with extreme reluctance that the Court . is forced to the conclusion that it is without power to grant the application, but it may not exceed the limits of authority.

Lest there be those who would draw the erroneous conclusion that the jury verdict was unwarranted, it may be pointed out that the evidence presented at the trial supported a verdict of guilty. In part, the result may have been contributed to by the defendant's failure to take the stand in a case where the issue of identity was so seriously contested. For no matter how often and how earnestly the Courts may charge that no adverse inference may be drawn therefrom, it has been truly said that "We should be blind to realities if we supposed that juries are unconscious of the omission of the defendant." [23] The "psychological impossibility not to have a presumption arise in the minds of jurors against an accused who fails to testify" has been urged upon the Supreme Court.[24]

Although avenues of judicial redress are closed here to the defendant, he is not without remedy. In those exceptional cases where rules of law of broad application work an injustice in an individual case, our institutions provide redress through the pardoning power.[25]

The defendant has heretofore filed an application for executive clemency and the Assistant United States Attorney has recommended favorable action thereon. The Court expresses the hope that prompt consideration will be given to the pending application so that the interests of justice may be served.

The United States Attorney is requested to forward to the Pardon Attorney a copy of this opinion.

The foregoing sufficiently states, and shall constitute, the findings of fact and conclusions of law.

22. The Committee advocated a motion to be made "at any time before or after final judgment." Rule 31(c), Preliminary Draft, May 1943; Rule 35, Second Preliminary Draft, February 1944, and Final Draft, June 1944; Proceedings of the Institute of the Federal Rules of Criminal Procedure, February 15th and 16th, 1946, at page 230. The two year time limit in Rule 33 is a liberalization of the old rule under which the motion had to be made within sixty days. See Notes of Advisory Committee on Rule 33.

23. United States v. DiCarlo, 2 Cir., 64 F. 2d 15, 18.

24. Bruno v. United States, 308 U.S. 287, 294, 60 S.Ct. 198, 200, 84 L.Ed. 257.

25. A century ago the Supreme Court cited as an instance in which the power to pardon was "particularly" applicable: "when the circumstances of any case disclosed such uncertainties as made it doubtful if there should have been a conviction of the criminal * * *." Ex parte William Wells, 18 How. 307, 310, 15 L.Ed. 421. The Court has since stated: "Executive clemency exists to afford relief from * * * evident mistake in the operation or enforcement of the criminal law." Ex parte Grossman, 267 U.S. 87, 120, 45 S.Ct. 332, 337, 69 L.Ed. 527.