# WILBUR COATES (c) *v*. STATE OF MARYLAND
[Nos. 31-39, January Term, 1942.]

*Decided April 22, 1942.*

The causes were argued before BOND, C. J., SLOAN, DELAPLAINE, COLLINS, FORSYTHE, and MARBURY, JJ.

*William L. Marbury, Jr.,* for the appellant.

*Robert E. Clapp, Jr., Assistant Attorney General,* with whom were *William C. Walsh, Attorney General,* and *J. Bernard Wells, State's Attorney,* and *Bernard G. Peter, Assistant State's Attorney of Baltimore City,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

The appellant, Wilbur Coates, a nineteen-year-old colored boy, was charged in nine separate indictments in the Criminal Court of Baltimore City. Six of these indictments were for robbery, one for assault with intent to rob, and two were for burglary. The appellant pleaded guilty in two robbery cases, in the case of assault with intent to rob, and in one burglary case, and testimony was taken before the court in each of these cases. The others were tried before the court. Sentences were imposed of ten years in the Maryland Penitentiary in each of the nine cases, to run consecutively, making a total of ninety years. This sentence of ten years in each case is within the limit fixed by law. Code, 1939, Art. 27, Secs. 13, 34 and 557. On November 26, 1941, the indictments were all filed and two days later the arraignments and trials were held on the same day and disposed

of in succession. The sentences were also entered on November 28, 1941. The appellant was not asked whether he wished counsel appointed and did not ask for such appointment. It is conceded that he could not have employed counsel at his own expense.

A preliminary question is whether the cases are before the court on the appeals or motions. The prisoner, in his ignorance of the proper procedure, addressed to the Chief Judge of this Court at Annapolis a letter which made it sufficiently clear that he wished his cases reviewed on appeal, and he gave the letter to the warden of the penitentiary, as disciplinary rules require, for mailing, within the time fixed by the rule of court for appeals. Delay in the hands of the warden, and in the mails, however, brought the letter to the Chief Judge after the lapse of that time, and it was then filed with the clerk of the Criminal Court in which the proceedings were had. The trial judge immediately appointed counsel to press the cases for the prisoner in this court. In ordinary practice then, the cases would not be reviewable here. But the delay was a result of the lack of counsel which is complained of, and the objection to the proceedings is one which denies force to any inartificiality in the appeal. It goes, indeed, back to the arraignment. If counsel should have been appointed at all, he should have been appointed before the cases were called for trial. The prisoner did all that his ignorance and lack of advice permitted in forwarding his appeal in time, and the nature of his objection requires that it be accepted as of that time. Moreover, the motions to strike out the pleas of guilty, verdicts and sentences, made by the counsel appointed were filed within the terms, all of which were denied and appeals taken from those denials which bring the objections up for review. *Margulies v. State*, 153 Md. 204, 137 A. 896; *Bosco v. State*, 157 Md. 407, 146 A. 238.

All the trials were before the court without a jury. A system of trying criminal cases before the court, sitting as a jury, has grown up and has been frequently

used in this State, and has been much commended elsewhere. *Rose v. State,* 177 Md. 577, 10 A. 2d 617. It is, of course, dependent upon the choice of the accused. The manner in which it has been administered by the courts, and the fairness used in such cases have resulted in a very large proportion of persons charged with crime electing to be tried by the courts rather than by juries. In that way, much time and expense have been saved, and in general, the rights of the accused have been adequately protected.

As this prisoner's cases were called for trial, he faced a possible total imprisonment for life; and that is in effect the total of the sentences imposed. It has long been the practice in this State for the court to provide counsel for defendants who face a possibility of life imprisonment, and in all criminal cases in which defendants are without counsel of their own securing, for the court to see that they are given all their rights and tried fairly.

The charge was robbery in the first case tried in which there was a plea of not guilty. The complaining witness testified that someone whom she could not identify hit her on the head and knocked her down and she handed him her pocketbook and he kept on cracking her. After appellant was apprehended he was questioned by the sergeant at the police station. The sergeant was asked the following questions:

"Q. Did you threaten him in any way? A. No.

"Q. Did you make him any promises? A. No.

"Q. Did you offer him any inducements? A. No.

"Q. What did he say, Sergeant?"

The witness then testified that Coates admitted taking a pocketbook from a young white girl at the time and place testified to by the prosecuting witness. The sergeant was then asked whether the appellant signed a statement to that effect. The answer was, "Yes, signed and witnessed." This signed statement was not produced or offered in evidence. The appellant was then asked whether he desired to ask the sergeant any questions, to which he answered, "No, sir." He also stated

that he did not desire to testify in the case. There was no other testimony and the verdict was guilty.

In the second case for robbery in which the appellant pleaded not guilty, three colored boys grabbed a white girl and snatched her purse and knitting bag. She was unable to identify any of her assailants. The police sergeant testified that he had a conversation with appellant about this case when he was asked the following questions: "Did you threaten him an any way? A. No, sir. Q. What did he say, if anything, Coates?" The sergeant then testified as to appellant's conversation to the effect that one of the other boys grabbed the pocketbook while he was standing alongside of him and that he got forty-seven cents of the money. He also said that the appellant and one of the other boys showed him where the pocketbook was dropped, but it could not be found there, however, a card which the prosecuting witness identified as being in the pocketbook was found at that place. The appellant was asked if he desired to cross-examine the witness, to which he replied, "No." He also stated that he did not want to testify in his own behalf. On that evidence he was found guilty.

In the third robbery case in which appellant pleaded not guilty, the woman robbed testified that three small boys grabbed her, took her pocketbook, rolled her on the pavement, cut her mouth open and injured her knee very badly. She could not identify them. She identified the pocketbook. In this case the same sergeant testified as to the statement made by the appellant. He was not asked any preliminary questions as to the manner in which the statement was obtained. He stated that the appellant and one of the other boys admitted attacking the lady at some place, they did not know where, and the pocketbook was found at the place where they said they dropped it. Appellant stated that he did not desire to cross-examine the witness or testify. On this testimony appellant was found guilty.

In the fourth robbery case in which a plea of not guilty was entered the prosecuting witness identified the appel-

lant as the person who grabbed her purse while she was inserting the key in her front door. The same sergeant testified as to the oral confessions made by the appellant. No preliminary questions were asked the sergeant as to how this confession was obtained. The appellant stated that he did not desire to cross-examine the witness or testify. On this testimony the appellant was found guilty.

In the burglary case in which a plea of not guilty was entered by the appellant, the owner of the store testified that in the morning he found that his cash register had been rifled. A side door through which entrance had been gained had been cut and a pane of glass in the door had been broken. The same sergeant testified that Coates admitted that he knew about this robbery and that he got two dollars out of it, which was given him by one of the other boys as his part. No preliminary questions were asked the sergeant as to the method of obtaining this statement. The appellant stated that he did not desire to cross-examine the witness or testify. On this evidence the appellant was found guilty.

Other cases were tried the same day in which other boys were charged with similar crimes, in some of which the appellant was charged, and in others he was not. All of the defendants were connected with one or more of the same sort of crimes and seemed to belong to the same gang. Attached to the record are statements made by Wilbur Coates, but these statements were never offered in evidence.

The cases were quickly disposed of on very brief testimony. There was no cross-examination of the witnesses. In many cases identity of the prisoner was made by confessions which were admitted without the necessary preliminary questions and the confessions which were committed to writing were not introduced in evidence. The accused received very little aid from the trial court, or from anyone else. The sentence of ninety years may well be considered as a sentence for life and the proceedings in these cases seem too superficial and hurried to serve as foundation for life imprisonment.

508

The Judge in passing sentence in these cases, the others mentioned therein including the appellant, said: "The others are a series of yokings, whatever they call it, all over town, beginning right down here in the Mount Vernon section, at 712 Park Avenue, right next door to where a late judge of the federal court used to live—and I think his family still lives there—and they run all the way up to Linden Avenue and Lanvale Street and Fulton Avenue and Bolton Street and that was a depraved condition of marauding on the streets of Baltimore at night by a wild-acting gang of colored ruffians, and it is impossible to give adequate police protection to every section of the city at all hours of the day and night and I think it presents a pathetic situation where young white women and middle-aged white women in the early hours of the evening, six-thirty, seven-thirty, nine-thirty, and the young lady in the first case coming home from visiting her mother-in-law at midnight or shortly after twelve o'clock at night is hit over the head with some kind of blunt instrument that caused her to bleed all over and then they escaped after grabbing her purse after she had ran from the vestibule. It is wanton highwaymanship. Their youth and their lack of mentality are not questions for me to pass upon. We have a Board of Mental Hygiene, whose function it is, amongst prisoners, to ascertain who are in need of medical treatment in the penal institutions and send them to such places as the State of Maryland provides. But it is the function of this court, I take it, to try to make the streets of Baltimore safe for men and women, particularly women, who are walking home at night and in the early hours of the evening, and all I can do is take these people out of circulation and put them in the penal institutions as mad dogs roaming the community, and leave it to the Governor and Parole Board to determine when they are rejuvenated and rehabilitated and I am sentencing them in every one of these robbery and burglary cases in their consecutive order to ten years in the penitentiary in each case, consecutively, which will put them away for the

rest of their lives, because the community is not safe with a gang of strong-arm men grabbing women by the neck and choking them and then robbing them of their purses and running around the corner and dividing their money."

Never in the State Courts has it been held that care for the interests of defendants in the appointment of counsel has been required as an essential to a valid trial, under constitutional or other requirement. Never until within the last year has it been argued that it was an essential. A trial for a capital crime, or other extremely serious crime, without having counsel appear for the prisoner (unless he refused it, perhaps), would be so contrary to the sense of justice of the community, and so far out of accord with the practice in the courts, that it would probably have been taken as an injustice that needed correction in some manner. Code, 1939, Art. 26, Secs. 7 and 8. Recent decisions of the Supreme Court of the United States, however, have raised such care for the interests of defendants in some cases to the position of a constitutional requirement, and that fact imposes upon this court the necessity of considering the essential justice of the proceedings sought to be reviewed. The decisions of the Supreme Court of the United States have not clearly defined the charges on which, or definitely fixed the character of trials in which prisoners must be provided with counsel in the State courts.

"Due process of law" as provided for in the Fourteenth Amendment to the Constitution of the United States, has been interpreted by this court to mean "law of the land" as provided by Article 23 of the Maryland Declaration of Rights. *Solvuca v. Ryan & Reilly Co.*, 131 Md. 265, 101 A. 710. The Supreme Court of the United States has held that the Sixth Amendment of the Constitution of the United States requires that defendants in the federal courts be represented by counsel unless the right to counsel is expressly waived. *Glasser v. United States*, 62 S. Ct. 457, 86 L. Ed. 405. Whether

the Fourteenth Amendment requires counsel for the accused in the State courts has not been finally determined by the Supreme Court of the United States. In the case of *Powell v. Alabama*, 287 U. S. 45, 53 S. Ct. 55, 65, 77 L. Ed. 158, 84 *A. L. R.* 527, the Supreme Court said: "All that it is necessary now to decide, as we do decide, is that in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." In the later case of *Palko v. Connecticut*, 302 U. S. 319, at page 328, 58 S. Ct. 149, at page 153, 82 L. E. 288, Justice Cardozo said: "The hearing, moreover, must be a real one, not a sham or pretense. *Moore v. Dempsey*, 261 U. S. 86, 43 S. Ct. 265, 67 L. Ed. 543; *Mooney v. Holohan*, 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791, 98 *A. L. R.* 406. For that reason, ignorant defendants in a capital case were held to have been condemned unlawfully, when in truth, though not in form, they were refused the aid of counsel. *Powell v. Alabama, supra,* 287 U. S. 45 at pages 67, 68, 53 S. Ct. 55, 63, 77 L. Ed. 158, 84 *A. L. R.* 527. The decision did not turn upon the fact that the benefit of counsel would have been guaranteed to the defendants by the provision of the Sixth Amendment if they had been prosecuted in a federal court. The decision turned upon the fact that in the particular situation laid before us in the evidence the benefit of counsel was essential to the substance of a hearing." We quote in the case of *Smith v. O'Grady*, 312 U. S. 329, 61 S. Ct. 572, 574, 85 L. Ed. 859: "The circumstances under which petitioner asserts he was entrapped and imprisoned in the penitentiary are wholly irreconcilable with the constitutional safeguards of due process. For his petition presents a picture of a de-

fendant, without counsel, bewildered by court processes strange and unfamiliar to him, and inveigled by false statements of State law enforcement officers into entering a plea of guilty."

Where the trial is fair and not a sham or pretense, the non-appointment of counsel does not appear to constitute lack of due process under decisions in the federal courts. The recent case of *Carey v. Brady, Warden (Gall v. Same)*, 125 F. 2d 253, 254, shows the difference of opinion among the lower federal courts, where it was said:

"We agree also that there was nothing in the evidence before him to show that either of the petitioners was denied due process, unless the failure to appoint counsel for them amounted of itself to such denial. On this question, the members of the court, after carefully studying the decisions of the Supreme Court in *Powell v. Alabama*, 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158, 84 *A. L. R.* 527; *Johnson v. Zerbst*, 304 U. S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461; *Palko v. Connecticut*, 302 U. S. 319, 327, 58 S. Ct. 149, 82 L. Ed. 288; *Lisenba v. California*, (314 U. S. 219), 62 St. Ct. 280, 86 L. Ed. (179), decided December 8, 1941; *Walker v. Johnston*, 312 U. S. 275, 61 S. Ct. 574, 85 L. Ed. 830, and a number of other recent decisions are divided and in doubt. One member of the court is of the opinion that the mere failure of the State court, upon request, to appoint counsel for an indigent prisoner does not amount to a denial of due process in the absence of other circumstances showing that such appointment is necessary to a fair trial, such as the youth and inexperience of the prisoner or complicated nature of the charge, the inflamed state of the public mind, acts of oppression on the part of public officers, etc., and that if such failure to appoint counsel should be held to be a denial of due process, it is not such a denial as would destroy the jurisdiction of the court to proceed with the trial of the case. Another member of the court is of the view that such failure to appoint

counsel is a denial of due process that would justify a reversal of the judgment upon appeal, but is not sufficient of itself to destroy the jurisdiction of the court and authorize the release of the prisoner, after sentence, on *habeas corpus*. The third member of the court is of the opinion that such a failure is of itself a denial of due process that destroys the jurisdiction of the court and entitles the prisoner to release on *habeas corpus*. Widespread confusion seems also to exist in the minds of judges and lawyers throughout the country with regard to these questions. See *Wilson v. Lanagan*, 1 Cir., 99 F. 2d. 544, *certiorari* denied 306 U. S. 634, 59 S. Ct. 486, 83 L. Ed. 1035; *Sanford v. Robbins*, 5 Cir., 115 F. 2d 435, *certiorari* denied 312 U. S. 697, 61 S. Ct. 737, 85 L. Ed. 1132; *Boyd v. O'Grady*, 8 Cir., 121 F. 2d. 146."

In these cases now before us, our conclusion is that counsel should have been appointed as an essential of due process of law. The prisoner, although vicious, was young and ignorant and unaccustomed to court procedure and apparently incapable of taking an active part in his trials. The penalties hanging over him were severe. The more revolting the crime and the worse the situation appears for him the more necessary it is that he have the protection of his legal rights. As care for his interests has now been made an essential in some cases, we think in these cases now before us he should have been provided at the outset with counsel.

> *Judgments in all nine cases reversed and motion to strike out pleas granted, and new trials awarded.*