# HUGH HARTMAN BALDWIN, JR. *v.* STATE OF MARYLAND

[No. 1179, September Term, 1981.]

*Decided May 6, 1982*

The cause was argued before LISS and WILNER, JJ., and CLAYTON C. CARTER, Associate Judge of the Second Judicial Circuit, specially assigned.

*Barbara Mello* for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Sidney S. Campen, State's Attorney for Talbot County,* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

In May, 1978, a two-year investigation by State and Federal authorities culminated in the issuance and execution of search warrants for the Atlantic Glass Factory in Easton (Talbot County) and a farmhouse located on Route 662 in Kent County. Among the items found and seized during the raids was a large quantity of Phencyclidine, a controlled dangerous substance (CDS).

On July 12, 1978, an eight-count criminal information was filed against appellant in the Circuit Court for Talbot County, charging him, at each of the two locations, with (1) unlawfully possessing a CDS (Phencyclidine) in sufficient quantity to indicate an intent to manufacture, distribute, and dispense the same; (2) manufacturing a CDS (Phencyclidine); (3) possession of machines, equipment, and implements adapted for the production of a CDS; and (4) maintaining a common nuisance. *See* Md. Code art. 27, § 286 (a) (1), (4), and (5).

Following a variety of pretrial motions, including motions to suppress evidence seized in the raids, appellant was tried before a jury in the Circuit Court for Cecil County, to which the case had been removed because of prejudicial pretrial publicity. After three days of trial, appellant was convicted on seven of the eight counts,[1] for which he was sentenced to a total of thirty-five years in prison (seven of which were suspended) and fined $105,000.

On appeal we reversed the convictions, concluding that the motions to suppress the evidence seized in the raids should have been granted. *Baldwin v. State,* 45 Md.App. 378 (1980). The search warrants authorizing the raids were invalid, we said, because they rested upon information

---

1. The jury acquitted appellant of the sixth count — manufacturing a CDS (Phencyclidine) at the Route 662 farmhouse.

obtained through illegal wiretaps. We therefore remanded the case for retrial on the seven open counts. The State, disagreeing with our conclusions, sought review in the Court of Appeals. On March 10, 1981, that Court affirmed what we had done, *State v. Baldwin,* 289 Md. 635 (1981); and on April 13, 1981, the case was returned to the Circuit Court for Cecil County. (Appellant's petition for writ of *certiorari* was denied by the Supreme Court of the United States on October 5, 1981. *Baldwin v. Maryland,* 454 U.S. 852, 102 S.Ct. 295 (1981).

Following our reversal of the initial convictions, while the further appellate proceedings were pending, appellant was released from prison on $100,000 bond. The bond was secured by property owned by appellant's parents and was conditioned upon appellant residing with his parents, remaining gainfully employed, and not leaving the State of Maryland.

On June 4, 1981, the assignment clerk commenced the retrial process by scheduling an "initial appearance" hearing for June 15. On June 3, 1981, appellant applied to the District Public Defender for representation by his office at the retrial. Although his application is not in the record (being addressed to the District Public Defender), we were told at oral argument that it was on whatever form is required by the Public Defender's Office and that the information supplied on it was under oath. That same day — June 3 — the District Public Defender declined representation on the basis that the appearance of private counsel had been entered for appellant and that the court had refused to permit that attorney to withdraw.

By June 5, that condition had changed. For reasons not clear in the record, private counsel withdrew his appearance. Notwithstanding that appellant was then without counsel, the District Public Defender continued to decline representation. On June 5, he wrote to appellant:

> "Your Application indicates that you are released on bail of $100,000. This indicates that you not only have resources, but resources of a most sub-

stantial kind. In addition, it appears that you have a college education and no personal living expenses.

Under those circumstances, and because your trial has been postponed from June 15, 1981, we believe that you do not qualify for representation under the criteria established in Article 27A of the Maryland Code."

As directed, appellant appeared before the court on June 15, 1981, for his initial appearance. Because he was without counsel, the court went through the litany required by Maryland Rule 723, informing appellant (among other things) that he had a right to a lawyer, that a lawyer could render important help to him, and that if he was "too poor to hire a lawyer," he could apply to the Public Defender.[2] Aware of what had already occurred, the court then, at appellant's request, agreed to determine "if the Court will give you a free lawyer, even though the Public Defender does not."

The court's inquiry was conducted in an informal manner, with appellant and the District Public Defender simply stating their respective positions. Neither of them testified under oath and no independent evidence was offered.

Appellant spoke first. Recounting the history of his case, he represented that he still owed money to his former trial and appellate counsel and that he did not "have any money to hire an attorney." Appellant also proffered that former trial counsel wanted a $20,000 retainer to conduct his

---

2. As a prelude to advising appellant of his various rights under Maryland Rule 723, the court told him that he was to be retried on only three of the seven counts upon which the case had been remanded — counts 5, 7, and 8, all dealing with the Route 662 farmhouse. The court stated that the maximum penalty on those counts was five years in prison and a $15,000 fine, "or a total maximum penalty of fifteen years and $45,000 fine." *Those statements were not correct.* Appellant, in fact, was retried on all seven open counts; he was convicted on four of them (counts 4, 5, 7, and 8), and was sentenced to a total of twenty years in prison (four of which were suspended) and fined $60,000. Although that presumably innocent misrepresentation may well, of itself, have been grounds to invalidate the subsequent proceedings, appellant has not complained of it in this appeal, and so we shall not further address the matter. Maryland Rule 1031; *Jacober v. High Hill Realty, Inc.,* 22 Md. App. 115, *cert. den.,* 272 Md. 743 (1974).

defense at retrial and that two local attorneys, who "really didn't want to handle the matter," had informed him that "it would be very expensive to hire another lawyer in."

In response, the District Public Defender related for the court the pertinent parts of appellant's application for appointed counsel. Appellant had represented, he said, that until two months before he had been taking home $2,000 per year as a freelance photographer; that "[h]e had no other income, no bank accounts"; "that the only cash that he had was $2.20"; "that he owned no motor vehicles or stocks or bonds"; that he was not owed any money; that his father was in the electrical business and his mother was a school teacher; that he owed money to his former attorneys and to his parents; that he was free on a "$100,000 property bond, which : . . had been posted by his parents"; and that "he had completed sixteen years of school."

He then gave his reasons for denying representation:

"[F]irst of all, our department or agency . . . is severely limited in its resources. . . . [I]t is extremely important that we use great care in assigning lawyers . . . and it was our feeling in this case that Mr. Baldwin . . . is most able and articulate. . . . [H]e's been out on a $100,000 bail since last summer. He has no living expenses. It would certainly seem to me that . . . there's little if any reason why he can't go out and hire his own lawyer. There certainly are jobs available. Secondly, it seems to me that a $100,000 bail . . . that anybody who has that kind of resources, it certainly indicates that there's more there. . . . I was indeed overwhelmed when I read the Daily Record and saw . . . [t]here are six individual appearances and three separate law firms . . . listed . . . as having appeared on behalf of Mr. Baldwin [on appeal]. . . . I am certain that those fees were not inexpensive. . . . [I]t just seemed to me that we should not deploy our forces . . . because Mr. Hartman [*sic*, Baldwin] . . . is perfectly able to obtain counsel himself."

The court then noted, *sua sponte,* that "[f]urther evidence of the economic status of the Defendant" could be derived from a consideration of the items seized in the raids conducted in May, 1978, which included some $17,000 in cash, promissory notes with an aggregate face value of $105,000, three boat titles, and a savings account passbook which appellant held "in conjunction with Shirley Baldwin, apparently the Defendant's mother." [3]

Although recognizing that "if assignment of counsel is based entirely upon liquidity and immediately available resources . . . the Court would be correct in assigning you counsel free of charge," the court nonetheless stated that it could not "remain oblivious and blind to circumstances and facts from which we can infer an ability to pay for representation." Adopting what was essentially the Public Defender's line of reasoning, the court thereupon declared appellant ineligible for appointed counsel. It stated that it could not ignore,

(1) "the status of the family . . . the fact that when the Court set bail upon remand of the case, bail was posted almost immediately in the sum of $100,000";

(2) "the potential of a college graduate to earn a living, for all it appears the Defendant is living with his parents essentially expense-free";

(3) "the Public Defender budget having been slashed from one and a quarter million to eight-tenths of a million dollars"; and

(4) "that this Defendant has been represented by three law firms in the past in this case in court."

In conclusion, the court stated:

"The Court notes that the representation of the Defendant as to his entitlement to counsel free of

---

**3.** Appellant protested the consideration given these items, noting that they were being held by the authorities and were thus not available to him. Furthermore, even if they were available, appellant represented that the items were worth little, if anything. The notes were said not to be "worth the paper they're written on," and the boats, two of which were said to "leak," were reported to be worth "a hundred dollars, a hundred-fifty dollars at the most."

charge was limited to the fact that he still owes other attorneys, and that one particular firm would want a $20,000 retainer to represent him. That his, extent of his contact with any other counsel has been, according to his testimony, with two Kent County lawyers who said representation would be expensive. But this was a generalization where there was no specific look at the case to see what was involved or what the fee might be.

And it is for all these reasons that the Court, consistent with the decision of the Public Defender in this case, denies the petition of the Defendant for a court appointed counsel free of charge, and will require the Defendant to provide his own legal representation or, at his option, to proceed without counsel."

Trial was set for July 29, 1981 — six weeks hence. When it commenced, appellant was still without counsel. Once again, he asserted his inability to afford private counsel. In a typed statement, admitted as a court exhibit, appellant advised the court:

"I have no financial resources with which to hire an attorney and because the Court refuses to appoint me an attorney, I am without an attorney today. . . .

The bond I am now on is a Property Bond which resulted from my parents putting up their house and property as collateral. My parents are unable to assist me financially in terms of hiring an attorney, I do not have any sevings [sic] to hire an attorney and any possible financial assets I do have claim to are in the possession of the Maryland State Police, who refuse to release such to me. . . .

. . . I am completely unable to prepare my case for trial. I am not in any way, shape or form capable to represent myself in this case especially taking into account the complexities of this case such as wiretap orders, search warrants, and other tech-

nical legal issues. Because I do not know what to object to or what to say during a trial what evidence is admissible and what evidence is not admissible and how to ask questions of witnesses or for that matter how to even summons witnesses, I must again ... request the Court to appoint me an attorney...."

Nonetheless, finding that there had been "no change in circumstances since the last ruling ... ," the court denied appellant's motion and proceeded to conduct the retrial without defense counsel. Other than appellant's repeated protestations that he was "not competent to defend" himself and that he objected "to these entire proceedings," he took no part in the trial, presented no evidence in his defense, and did not cross-examine any of the State's witnesses.

From his conviction on four of the remaining seven counts,[4] for which he was sentenced to a total of twenty years imprisonment (four years of which was suspended), $60,000 in fines, and five years probation, appellant noted this appeal, contending that

"The trial court abused its discretion, and thus denied [him] rights secured ... by the Sixth and Fourteenth Amendments of the Constitution of the United States, Article 21 of the Maryland Declaration of Rights, and Md. Code Anno., Article 27A, § 6 (f), in finding him not to be indigent and therefore not to be entitled to the appointment of counsel at public expense."

Finding merit in his contention, we shall reverse the judgment of the court below and remand this case for yet another retrial.

---

4. Although the State attempted to make a case against appellant on the remaining counts of the information, in the absence of the evidence which we held inadmissible in the earlier appeal, it was only able to obtain a guilty verdict on one of the four counts involving the activities at the Atlantic Glass Company (maintaining a common nuisance). The other guilty verdicts were on the three open counts relating to activity at the Route 662 farmhouse.

## I. *The Right to Counsel*

Unlike some of the other hallmarks of what we now regard as due process of law, the right of an accused to the assistance of counsel is of relatively recent origin. It did not come to us through the common law of England. Under early English common law, persons accused of felony were not permitted the assistance of counsel at trial. Even by the end of the Eighteenth Century, that prohibition had been relaxed only to the point of allowing the full participation of counsel in cases of high treason (or misprision thereof), and of permitting counsel to instruct a defendant as to points of *law* in other felony cases. *See, in general,* 4 Blackstone, *Commentaries On The Laws Of England,* ch. 27, 355-56 (Hammond ed. 1890); Plucknett, *A Concise History Of The Common Law,* 434-35 (5th ed. 1956); *and compare Raymond v. State ex rel. Szydlouski,* 192 Md. 602, 606 (1949).

Immediately upon Independence, Maryland abrogated whatever was left of the common law exclusion of counsel by inserting into its first Constitution, as part of art. 19 of the Declaration of Rights (1776) that "in all criminal prosecutions, every man hath a right . . . to be allowed counsel." Fifteen years later, a similar right was engrafted onto the Federal Constitution as part of the Sixth Amendment — that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

For about 150 years, these Constitutional provisions were construed literally and narrowly. They afforded a defendant the right to *have* counsel if he could *obtain* counsel; but they did not *require* the participation of counsel, and they did not obligate the body politic to provide counsel for indigent defendants. *See Raymond v. State ex rel. Szydlouski, supra,* 192 Md. 602, so interpreting the Maryland provision; *also Marvin v. Warden,* 212 Md. 634 (1957); *Wilson v. State,* 284 Md. 664, 669 (1979).

The first major change in that thinking seemed to come with *Johnson v. Zerbst,* 304 U.S. 458 (1938), where, as characterized later in *Betts v. Brady,* 316 U.S. 455, 464-65

(1942), the Supreme Court construed the Sixth Amendment right "to require appointment of counsel in all cases where a defendant is unable to procure the services of an attorney, and where the right has not been intentionally and competently waived." [5] As *Betts v. Brady* made clear, however, the Sixth Amendment right of counsel applied only to Federal prosecutions. It was not to be regarded as a "fundamental right, essential to a fair trial," and thus available to defendants in State prosecutions under the "due process" clause of the Fourteenth Amendment. *Id.* at 471.

Thus it was that, except in such egregious situations as spawned *Powell v. Alabama,* 287 U.S. 45 (1932), for example, the appointment of counsel for indigent defendants in State prosecutions remained a matter of legislative policy for the States, most of which, as the *Betts* Court noted, empowered their courts to appoint counsel "where that course seems to be required in the interest of fairness." [6] *Id.* at 472.

---

5. *Compare Powell v. Alabama,* 287 U.S. 45 (1932), where the Court noted the *statutory* right to appointed counsel in Federal proceedings and concluded that, under certain circumstances, a denial of appointed counsel could amount to a denial of the broader right to due process of law.

6. Maryland first adopted that approach in 1886 when the General Assembly authorized the Circuit Courts and the Criminal Court of Baltimore, at public expense, to "appoint counsel to defend any person in the trial of any criminal case in said Courts, whenever, in the judgment of the Court in which any such case is pending, a just regard for the rights of the accused requires it." Acts of 1886, ch. 46, § 1.

The statute did not confer a *right* to appointed counsel, only the discretionary authority of the court to make such an appointment; and generally, the Court of Appeals did not disturb the trial court's exercise of its statutory discretion. *See Knott v. Warden,* 200 Md. 658, *cert. den.* 344 U.S. 847 (1952); *Smith v. State,* 180 Md. 529 (1942); *Raymond v. State ex rel. Szydlouski, supra,* 192 Md. 602. *Compare, however, Coates v. State,* 180 Md. 502, *cert. den.* 317 U.S. 625 (1942), where the Court, at p. 509, noted that "[a] trial for a capital crime, or other extremely serious crime, without having counsel appear for the prisoner (unless he refused it, perhaps), would be so contrary to the sense of justice of the community, and so far out of accord with the practice in the courts, that it would probably have been taken as an injustice that needed correction in some manner"; *and see Jewett v. State,* 190 Md. 289 (1948), where the Court, though declining to make the appointment of counsel a Constitutional right, suggested, at p. 297, that "the wise practice, in any serious case, is to appoint counsel" — unless the accused waives the appointment.

In 1949, as part of the first Criminal Rules of Practice and Procedure (Part IV, G.R.P.P.), the Court of Appeals made firm and binding the principle enunciated in *Coates* and suggested again in *Jewett.* Criminal Rule

The "matter of grace" theory ended on March 18, 1963, when in *Gideon v. Wainwright,* 372 U.S. 335 (1963), the Supreme Court expressly overruled *Betts v. Brady* and concluded that the Sixth Amendment right to counsel, as explicated in *Johnson v. Zerbst, supra,* applied with full force to State prosecutions through the "due process" clause of the Fourteenth Amendment. The right of an indigent defendant in State court to appointed counsel had been "Constitutionalized."

The immediate response to *Gideon* was a change in Maryland Rule 719 b (see footnote 6, *ante*) to require the appointed of counsel for any accused "who is not financially able to obtain counsel [and who] requests assignment of counsel" in any case in which the charge carried a maximum penalty of six months or more imprisonment or a fine of $500 or greater. A secondary response was a growing interest in the creation of a public defender system as an alternative to individual court appointments.

Consideration of a public defender system gained momentum as the Supreme Court began to broaden the right to counsel beyond the trial itself, extending it further back into the pretrial investigatory and accusatory processes.[7]

1(b) required that if a defendant appeared at arraignment without counsel, "the court shall, in all capital cases or other serious cases, assign counsel to defend him." *See Hill v. State,* 218 Md. 120 (1958), reviewing the history of Criminal Rule 1(b). That remained the law until January, 1962, when the Court amended the Rule (then appearing as Maryland Rule 719b) to provide that, unless the accused "elects to proceed without counsel or is financially able to obtain counsel," the court "shall" assign counsel if the offense charged carried a sentence of death or imprisonment for five years or more, and "may" assign counsel in any other case. The new Rule permitted the court to require a claim of indigency to be "verified by a sworn statement in such form and with such content as the court designates."

7. *See, for example, United States v. Wade,* 388 U.S. 218 (1967) and *Gilbert v. California,* 388 U.S. 263 (1967), providing the right to counsel at lineups; *Miranda v. Arizona,* 384 U.S. 436 (1966), right to counsel at custodial interrogations; *Hamilton v. Alabama,* 368 U.S. 52 (1961) and *White v. Maryland,* 373 U.S. 59 (1963), right to counsel at arraignment. As a response to this growing trend, legislation was proposed in the General Assembly as early as 1967 to study the efficacy of a public defender system (*see* SR 2, SR 30 (1967)), followed in each subsequent year by bills to create such a system. *See* SB 150, HB 336, HB 1337, HB 1338 (1968); SB 33, SB 298, SB 543, HB 165 (1969); SB 711 (1970). In July, 1970, the Governor appointed a Commission chaired by the Attorney General to study a public defender system, which worked in conjunction with a special committee of the Baltimore City Bar Association. In 1967, Montgomery County created

The ultimate progenitor of a Statewide public defender system in Maryland, however, appeared to be *Coleman v. Alabama,* 399 U.S. 1 (1970), wherein the Supreme Court extended the Sixth Amendment right to counsel to preliminary hearings. That called directly into question the ability of the State to comply with its expanding Constitutional obligations, especially in the large metropolitan areas, solely through a system of court-appointed counsel.[8] It culminated in the enactment of art. 27A by the 1971 General Assembly, creating a Statewide public defender system.

The new system made at least two significant changes from that which it replaced: (1) it was to be administered primarily by an Executive official — the Public Defender — rather than by the individual trial and appellate courts throughout the State; and (2) whereas court appointments under the old system were paid for primarily by the counties (and Baltimore City), the new program was to be entirely State-funded through the Public Defender's budget. Those changes prompted the Legislature to develop some standards for the program — criteria for determining eligibility for the appointment of counsel at public expense. Under the old system, there were no clear and universal criteria; with some exceptions, judges considering the appointment of counsel apparently used whatever standards they thought appropriate, and it does not appear that their determinations in that regard were ever disturbed on appeal.[9]

---

a local public defender system followed by Harford and Frederick counties, and in 1970, the Legal Aid Bureau in Baltimore City established an interim public defender operation.

**8.** In an appendix to a 1970 Report by the Legal Aid Bureau, Inc. with respect to its Interim Defender Program September 7, 1970 through January 15, 1971, it was estimated that there were 16,800 indigent criminal defendants being processed in the then-Municipal Court of Baltimore (the forerunner of the District Court) and that less than 10,000 were being represented by counsel. Of the 5,000 such defendants whose cases were transferred to the Criminal Court of Baltimore, it was estimated that only about half were afforded counsel in the Criminal Court. *See* Appendix C to the Report.

**9.** For discussion of the problems and complexities which confronted courts faced with the task of determining eligibility for appointed counsel, *see generally* Legislation Note, *Eligibility for Appointed Counsel in Criminal Cases: Proposed Standards and Determination Procedures,* 18 DePaul L. Rev. 243 (1968); Comment, *The Definition of Indigency: A Modern-Day Legal Jabberwocky,* 4 St. Mary's L. J. 34 (1972); Fortune, *Financial Screening in Criminal Cases — Impractical and Irrelevant,* 1973 Wash. U.

The Legislature made clear in the very beginning of the new law (art. 27A, § 1) that its purpose was to implement the underlying Constitutional mandate — "to provide for the realization of the constitutional guarantees of counsel in the representation of indigents . . . in criminal and juvenile proceedings within the State. . . ." It did this primarily by creating the office of Public Defender (§ 3) and stating that it was his "primary duty . . . to provide legal representation for any *indigent* defendant, *eligible* for services under this article." (§ 4 (a); emphasis supplied.)

It is, to some extent, unfortunate that the Legislature used both terms, "indigent" and "eligible," because in the context of their use, there appears to be some overlap.

> "Indigent," as a noun, is defined in § 2 (f) as meaning,

> "any person taken into custody or charged with a serious crime . . . who under oath or affirmation subscribes and states in writing that he is financially unable, without undue hardship, to provide for the full payment of an attorney and all other necessary expenses of legal representation." [10]

Under that definition, a person is not an "indigent" by reason of what he *is,* but by reason of what he *says he is.* The real key to determining indigence (eligibility) is stated in § 7(a):

> "Eligibility for the services of the Office of the Public Defender shall be determined on the basis of the need *of the person seeking legal representation.*

L. Q. 821; Stifler, *Determining the Financial Status of an Accused,* 54 Ill. B. J. 868 (1966); Harlan, *Determining Indigency in Texas: Findings from Preliminary Research,* 3 Am. J. Crim. L. 1 (1974); Rothstein, *Criteria for the Appointment of Counsel in Massachusetts Criminal Cases,* 6 Suffolk U. L. Rev. 855 (1972); Comment, *Determination of the Right to Counsel,* 5 Willamette L. J. 663 (1969); Annot., *Determination of Indigency of Accused Entitling Him to Appointment of Counsel,* 51 A.L.R.3d 1108 (1973). Although the Court of Appeals occasionally reversed a trial court's refusal to appoint counsel, few, if any, such reversals were based upon a disagreement as to whether the defendant was indigent.

10. The term "serious crime" is defined in § 2 (h) as including any felony or a misdemeanor for which imprisonment for three months or more or a fine of $500 or more is possible.

Need shall be measured according to the financial ability *of the person* to engage and compensate competent private counsel and to provide all other necessary expenses or representation. Such ability shall be recognized to be a variable depending on the nature, extent and liquidity of assets; the disposable net income *of the defendant;* the nature of the offense; the effort and skill required to gather pertinent information; the length and complexity of the proceedings; and any other foreseeable expenses." (Emphasis supplied.)

The initial determination, under the law, is to be made by the Public Defender; and to assist him in making it, § 7 (b) authorizes him to "make such investigation of the financial status of each defendant at such time or times as the circumstances shall warrant. . . ."

Obviously cognizant that shifting sands of fortune might subsequently render inaccurate a previous eligibility determination, and also recognizing that time might not always permit a thorough investigation into the financial status of a defendant prior to the rendition of services, the General Assembly provided in art. 27A a comprehensive scheme whereby the Public Defender could obtain reimbursement from defendants later found able to pay for part or all of his services. Thus, § 7 provides in pertinent part:

(1) When services are provided to an eligible *child* (defined as a person under eighteen years of age), his parents shall be obliged to reimburse the Public Defender "in such amounts as they can reasonably be expected to pay," § 7 (a);

(2) When a determination of eligibility cannot be made before services are rendered, the Public Defender may undertake provisional representation, with the defendant being obligated to reimburse the Public Defender if he is subsequently determined to be ineligible, § 7 (a);

(3) When a defendant has or expects to have the means to meet some part of the expenses, he shall be obliged to reimburse the Public Defender "in such amounts as he can reasonably be expected to pay," § 7 (c);

(4) That a lien exists "on any and all real property or personalty in which the defendant shall have or acquire an interest, except for [his] residence . . ." for services rendered, § 7 (d);

(5) That the court may order a defendant to reimburse the Public Defender for services rendered as a condition "of any sentence, judgment, or stay of judgment . . . if the court finds that the defendant has the ability to make such reimbursement," § 7 (g); and

(6) That the Department of Budget and Fiscal Planning "shall do all things necessary and proper to collect all moneys due . . . by way of reimbursement for services rendered pursuant to [art. 27A]." § 7 (f).

In obvious recognition of the fact that the whole system has Constitutional underpinnings and that the courts must, of necessity, be the ultimate protector of those underpinnings, the Legislature provided in § 6 (f) of the law that "[n]othing in this article shall be construed to deprive any court. . . of its authority to appoint an attorney. . . where the Office of the Public Defender declines to provide representation to an indigent person *entitled to representation under this article.*" (Emphasis supplied.) *See also* Maryland Rule 723 b 6 and c 4.

## II. *The Court's Responsibility*

In *Thompson v. State,* 284 Md. 113 (1978), the Court of Appeals seemed to hold that if the Public Defender declines to represent a defendant — even on grounds of non-eligibility (as opposed to a potential conflict of interest) — the court has no authority to order him to provide representation.[11] Upon that premise, the question before us is

11. *See* 284 Md. at 128: "The Public-Defender wanted to leave it up to the court, making clear that if the court so ordered he would provide representation. The court refused to so order, properly we believe, on the ground that the question whether the Public Defender represented a particular defendant was for the Public Defender and not for the court." It would appear from this, by logical extension, that, although the court may appoint any other qualified counsel to represent an indigent defendant, it may not appoint the Public Defender against his wish.

not whether the Public Defender erred in declining representation but whether the court was derelict in discharging its own responsibility to assure compliance with appellant's Constitutional right of counsel, in accordance with its authority under § 6 (f) of art. 27A.

Section 6(f) does not specify, directly, either the procedure or the standard to be employed by the court. *Thompson* tells us that the court must "make its own independent determination whether a defendant is indigent and otherwise eligible to have counsel appointed," *id.* at 129; but it provides little guidance as to how that determination is to be made.

Reading the statute (art. 27A) as a whole in light of its declared purpose, it seems clear to us that, in making its own independent determination of eligibility,

(1) The court must conduct its own inquiry into the matter. It is not restricted to the information relied upon by the Public Defender, or to the Public Defender's evaluation of such information. Rather, the court should consider any information offered by the parties which may reasonably bear upon the defendant's ability to afford private counsel, and make its own evaluation of the relevance and credibility of such information and the weight to be accorded it.

(2) The proceeding may be as formal or informal as the court directs. The court may require testimony under oath or it may simply hear from the parties and witnesses as it did here.[12]

(3) The court must weigh the evidence before it and make its determination in accordance with the criteria set forth in § 7 (a). Although it may evaluate the evidence differently than the Public Defender, it must use the same statutory standards. That is evident not only from the whole scheme of art. 27A, but from the particular language used in § 6 (f). That section, as noted, authorizes the court to appoint counsel for "an indigent person entitled to representation under

---

12. We do not regard the reference to an oath or affirmation in § 2(f) as necessarily requiring that evidence before the court be under oath. That section requires only a general statement of indigence under oath, and presumably is satisfied when the defendant makes his application to the Public Defender.

this article." An "indigent person entitled to representation" is one declared "eligible" pursuant to the standards laid down in § 7 (a).

### III. *The Decision In This Case*

The court signaled the error in its conclusion when it rejected the notion that "assignment of counsel is based entirely upon liquidity and immediately available resources," and relied instead upon inferences of wealth for which there is no support in the record and upon resources over which appellant had no control. Section 7 (a) makes clear that a defendant's financial ability must be measured in terms of *his* resources — the extent and liquidity of *his* assets, *his* disposable net income. The uncontradicted evidence in this record shows that appellant had *no* liquid assets and little or no disposable net income.

The court relied upon the "status" or presumed resources of appellant's family, but except for the fact that the parents had earlier pledged their home as collateral for appellant's bail bond, there was no evidence to show (1) what other resources they had, or (2) what part, if any, of them they were willing to commit to appellant's defense. Absent clear evidence of some firm commitment by the family to devote their resources to appellant's defense, those resources cannot be imputed to appellant or considered in determining his indigence because he has no right to or control over them. They are not his assets. *See Knapp v. Hardy,* 523 P.2d 1308 (Ariz. 1974); *Sapio v. State,* 223 So.2d 759, 761 (Fla.App. 1969); *Keur v. State,* 160 So.2d 546 (Fla.App. 1963); *People v. Gustavson,* 269 N.E.2d 517 (Ill.App. 1971); *Schmidt v. Uhlenhopp,* 140 N.W.2d 118 (Iowa 1966); *State v. Jensen,* 241 N.W.2d 557, 561-62 (N.D. 1976); 1 *ABA Standards for Criminal Justice,* Standard 5-6.1 (2d ed. 1980) and Commentary thereto; Stifler, *supra,* 54 Ill. B. J. at 875-77; Legislation Note, *supra,* 18 DePaul L. Rev. 254-55; *and cf. United States v. Rubinson,* 543 F.2d 951, 964 (2d Cir.), *cert. den.* 429 U.S. 850 (1976). The same principle holds true with respect to the assets seized in the raids. They were being held by the

authorities subject to confiscation, and obviously were not available to appellant.

Nor can the fact that bond was posted for appellant be used as a ground to deny appointed counsel, especially when the bond was secured by the resources of persons other than appellant. *See* Annot., *supra,* 51 A.L.R.3d 1108, 1116 and cases cited therein; 1 *ABA Standards, supra,* Standard 5-6.1.

Appellant's presumed employability forms no proper basis for denying appointed counsel on the state of this record. There was no evidence of substantial employment opportunities in the area; [13] trial was scheduled six weeks hence; appellant had already once been convicted on major drug charges; and the conditions of his bond required that he live with his parents and not leave the state. Even if he could have found a well-paying job for six weeks, the evidence showed that private counsel insisted on a substantial retainer in advance before even becoming involved.

Finally, it goes without saying that reductions in the Public Defender's budget and his desire to be frugal have no relevance whatever in the matter. The question is whether *appellant* was indigent, not the Public Defender. The court's obligation was to uphold the Constitution in the manner directed by the statute and by Maryland Rule 723, and that obligation is not subject to or in any way dependent upon the level of appropriations received by the Public Defender. *See Bramlett v. Peterson,* 307 F.Supp. 1311, 1317 (M.D.Fla. 1969), *citing Phillips v. Cole,* 298 F.Supp. 1049 (N.D.Miss. 1968).

The fact is that there was no evidence to support the court's determination that appellant was financially able to provide private counsel. Indeed, the only relevant evidence was directly to the contrary. If, because of some unarticulated suspicion that appellant had command over resources that could be devoted to the obtention of private

---

**13.** According to the United States Department of Labor, the unemployment rate in Kent County (appellant's home) was 10.6% in June, 1981, rising to 14% in July, 1981. *See Employment and Unemployment in States and Local Areas,* January - October, 1981, U.S. Dept. of Labor, Bureau of Labor Statistics (December, 1981).

counsel, the court was in any way in doubt about the matter of his indigence, it should have heeded the advice we gave in *Laquay v. State,* 16 Md.App. 709, 725 (1973): "It is suggested that if there be real uncertainty, it be resolved by providing the assistance of counsel rather than denying it."

By declining to appoint counsel, the court failed to discharge its responsibility under § 6 (f) of art. 27A, proceeded to trial in contravention of Maryland Rule 723, and thus effectively denied appellant his Federal and State [14] Constitutional right to counsel.

> *Judgments reversed; case remanded for retrial; Talbot County to pay the costs.*

---

**14.** It appears from language in *Williams v. State,* 292 Md. 201, 217-18 (1981), that the Court of Appeals has tacitly overruled its earlier decisions giving a narrow construction to art. 21 of the Maryland Declaration of Rights and has now equated the State provision with its Sixth Amendment counterpart, requiring the appointment of counsel for indigent criminal defendants.